976 F.2d 1016
 23 Fed.R.Serv.3d 629, RICO Bus.Disp.Guide 8080
 MIDWEST GRINDING COMPANY, INC., an Illinois Corporation,
Plaintiff-Appellant, Cross-Appellee,
v.
Joshua M. SPITZ, an individual, Aron Grunfeld, an
individual, and U.S. Grinding & Fabricating, Inc.,
an Illinois Corporation,
Defendants-Appellees, Cross-Appellants.
 Nos. 91-2686, 91-2834.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 30, 1992.
Decided Sept. 16, 1992.
 
 Weston W. Hanscom, Richard J. Jacobson (argued), Michael K. Cavanaugh, Keck, Mahin & Cate, Chicago, Ill., for plaintiff-appellant.
 Stephen L. Tyma (argued), William L. Kabaker, Lawrence L. Grazian, Schwartz & Freeman, Chicago, Ill., for defendants-appellees.
 Before COFFEY, FLAUM, and KANNE, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 Midwest Grinding Co., Inc. (Midwest) filed suit against defendants Joshua Spitz, Aron Grunfeld, and U.S. Grinding & Fabricating, Inc. (U.S. Grinding), alleging that they had engaged in a fraudulent scheme to divert customers and employees away from Midwest in violation of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 et seq., and state common law. The defendants filed a motion to dismiss, which the district court granted in part. The court subsequently disposed of Midwest's remaining claims on a motion for summary judgment. Midwest appeals both of those rulings, and the defendants cross-appeal the district court's partial denial of their motion to dismiss. We affirm.
 
 I.
 
 2
 Midwest entered into the metal grinding business in 1976. For over a decade, Spitz, who held a one-third stake in Midwest, managed the company's day-to-day operations as president and board member. As will later become relevant, Spitz's relationship with Midwest was not governed by a non-competition or confidentiality agreement, which would have prevented him from competing with Midwest or soliciting its customers in the event he left its employ. In 1984, one of Midwest's customers, Klein Tools, Inc., bought a two-thirds interest in Midwest.
 
 
 3
 In January 1986, a close friend of Spitz, Aron Grunfeld, decided that he, too, would get into the metal grinding business, and formed U.S. Grinding. Although Spitz was never an owner or officer of Grunfeld's new venture, evidence suggests that, while still employed by Midwest, he did play a role in its formation: he accompanied Grunfeld to an attorney's office to discuss incorporation, made a trip to Michigan to examine machinery for U.S. Grinding, and assisted in selecting real estate for its manufacturing facility. Moreover, after U.S. Grinding was up and running, several witnesses observed Spitz making visits to U.S. Grinding's facility, often in a Midwest company van, and telephone records revealed numerous calls between Grunfeld and Spitz during this period. Furthermore, a number of Midwest employees went to work for U.S. Grinding between April and July 1986, and evidence indicated that Spitz may have induced some of these transfers; in June 1986, for example, Spitz fired or laid off Midwest's entire night shift of six workers, several of whom mysteriously reappeared as employees of U.S. Grinding. All of this suspect activity coincided with a steady stream of Midwest customers jumping ship to utilize the services of upstart U.S. Grinding. Indeed, from February through August 1986, Midwest suffered a 40% drop in net sales compared to the previous year. Alarmed by this decline, Midwest's directors asked Spitz for an explanation; he attributed the decline to a depressed market, assuring them that he had been devoting substantial time out of the office trying to generate new business.
 
 
 4
 That reassurance notwithstanding, Spitz resigned from Midwest in August 1986 and immediately went to work for U.S. Grinding. In a letter to his co-shareholder (Klein Tools), Spitz offered to sell his one-third ownership in Midwest, neglecting to disclose his past or present relationship with U.S. Grinding. In response to Spitz's departure, Midwest filed this suit seeking to enjoin Spitz and U.S. Grinding from soliciting its customers and asking for damages under RICO. 18 U.S.C. §§ 1962(c) and (d).[1] Midwest also asserted pendent common-law claims alleging breach of fiduciary duty and tortious interference with business relationships.
 
 
 5
 The defendants responded to Midwest's complaint with a motion to dismiss for failure to state a claim, Fed.R.Civ.P. 12(b)(6), and for failure to plead fraud with particularity. Fed.R.Civ.P. 9(b). While this motion was pending, Midwest amended its complaint twice and supplemented it once, adding, among other things, Grunfeld as a defendant and allegations of two new schemes uncovered during discovery. The first alleged scheme involved Cardinal Metals, Inc. (Cardinal), a steel supplier which occasionally purchased grinding services from Midwest. According to Midwest, Spitz and Grunfeld maintained a secret 50% stake in Cardinal and, as part of the scheme to defraud Midwest, Spitz routinely undercharged Cardinal for metal grinding services via invoices sent through the mails (the undercharging scheme). In the second new scheme, Midwest maintained that the defendants tried to cover their tracks during the course of this lawsuit by lying about Spitz's involvement with U.S. Grinding in depositions and in requests to admit (the cover-up scheme). Thus, the alleged pattern of racketeering now entailed three separate stages, covering a 35-month period, all designed to inflict economic injury on Midwest: routine undercharges of Cardinal in 1985 and 1986, repeated diversion of customers and employees from Midwest to U.S. Grinding in 1986, and a cover-up of those activities during the course of this litigation.
 
 
 6
 The district court subsequently granted in part the defendants' motion to dismiss. Midwest Grinding Co., Inc. v. Spitz, 716 F.Supp. 1087, 1090-92 (N.D.Ill.1989). First, it dismissed the allegations of a scheme to undercharge Cardinal Steel for lack of specificity, id. at 1093, second, it dismissed the allegations of a cover-up for failure to state a claim, id. at 1093, and third, it dismissed the RICO claims against Grunfeld under 18 U.S.C. §§ 1962(c) and (d) for lack of specificity. Id. at 1094. However, the court refused to dismiss the § 1962(c) RICO count against Spitz, and the § 1962(d) RICO conspiracy count against Spitz and U.S. Grinding, concluding that Midwest had sufficiently pled a pattern of racketeering. Id. at 1095-96. The court added in a footnote that Midwest was denied leave to file a third amended complaint to correct its pleading deficiencies. Id. at 1094 n. 4.
 
 
 7
 After several years of additional discovery, the district court granted the defendants' motion for summary judgment on the remaining §§ 1962(c) & (d) RICO counts, Midwest Grinding Co., Inc. v. Spitz, 769 F.Supp. 1457 (N.D.Ill.1991), reversing its earlier decision that Midwest had adequately pled a pattern of racketeering. On appeal, Midwest challenges both that ruling and the earlier rulings dismissing portions of its complaint. The defendants cross-appeal, alleging that the district court erred in not disposing of the entire case on its motion to dismiss.
 
 
 8
 We review de novo the court's decision to dismiss portions of Midwest's complaint, assuming the truth of all well-pleaded factual allegations and drawing all reasonable inferences in its favor. Prince v. Rescorp Realty, 940 F.2d 1104, 1106 (7th Cir.1991). Likewise, we review de novo the district court's decision to grant the defendants' motion for summary judgment, Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), again viewing the facts and inferences in Midwest's favor. Id. With these familiar standards in mind, we turn to each of the parties' contentions on appeal.
 
 II.
 
 9
 Congress enacted RICO in an attempt to eradicate organized, long-term criminal activity. To that end, Congress chose to supplement criminal enforcement of its provisions with a civil cause of action for persons whose business or property has been injured by such criminal activity. 18 U.S.C. § 1964(c). To encourage private enforcement, Congress provided civil RICO plaintiffs with the opportunity to recover treble damages, costs, and attorney's fees if they can successfully establish the elements of a RICO violation by a preponderance of the evidence. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 491-93, 105 S.Ct. 3275, 3282-83, 87 L.Ed.2d 346 (1985). The elements of a RICO violation consist of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Id. at 496, 105 S.Ct. at 3285. A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). Predicate acts are acts indictable under a specified list of criminal laws, 18 U.S.C. § 1961(1)(B), including mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343. Midwest accused the defendants of committing hundreds of acts of mail and wire fraud in the process of carrying out the alleged diversion scheme.
 
 
 10
 The principal issue before us is whether the district court erred in finding that Midwest had not alleged a pattern of racketeering. Before reaching that issue, however, we first examine the court's decision to dismiss certain portions of Midwest's complaint on the defendants' Rule 12(b)(6) motion, because those rulings directly impact our pattern analysis. In that regard, Midwest contends that the district court erred in dismissing both the undercharging and cover-up allegations, and compounded that error by denying Midwest leave to correct its pleading deficiencies. These erroneous rulings, Midwest contends, severed the head (the undercharging scheme) and tail (the cover-up scheme) from the conspiracy, truncating the racketeering activity from thirty-five to nine months. This in turn provided the foundation, Midwest maintains, for the court's erroneous pattern analysis.
 
 A.
 
 11
 Fed.R.Civ.P. 9(b) requires that a plaintiff plead "all averments of fraud [with] particularity," and this rule is of course applicable to allegations of fraud in a civil RICO complaint. See Graue Mill Dev. Corp. v. Colonial Bank & Trust Co., 927 F.2d 988, 992 (7th Cir.1991); U.S. Textiles, Inc. v. Anheuser-Busch Cos., 911 F.2d 1261, 1268 n. 6 (7th Cir.1990). Although Rule 9(b) requires that a RICO plaintiff provide only a general outline of the alleged fraud scheme--one sufficient to reasonably notify the defendants of their purported role in the scheme--the complaint must, at minimum, describe the predicate acts with some specificity and "state the time, place, and content of the alleged communications perpetrating the fraud." Graue Mill, 927 F.2d at 992. The court determined that Midwest's claim of an undercharging scheme fell short of this standard by failing to identify the specific dates on which Spitz sent the false invoices. It found Midwest's omission "perplexing in light of the fact that Midwest had engaged in over two years of discovery when it filed [its second amended] complaint," Midwest Grinding, 716 F.Supp. at 1093, and dismissed the undercharging scheme from the suit.
 
 
 12
 Midwest asserts that it was unnecessary to list the date of each undercharging transaction because to do so would violate Fed.R.Civ.P. 8, which instructs plaintiffs to limit claims in pleadings to a "short and plain" description. Tomera v. Galt, 511 F.2d 504 (7th Cir.1975) (balancing the specificity requirement of Rule 9(b) against the generality requirement of Rule 8). It further contends that in cases involving a lengthy period of fraud, the exact date and time of each fraudulent act need not be specifically alleged. Hagstrom v. Breutman, 572 F.Supp. 692, 697 (N.D.Ill.1983). Finally, Midwest argues that the particularity requirement is less stringent in cases, such as this, where the "time, place, and content of the false representations" are uniquely within the defendants' knowledge. P & P Marketing, Inc. v. Ditton, 746 F.Supp. 1354, 1363 (N.D.Ill.1990).
 
 
 13
 We reject these contentions. First, the specificity standard, at minimum, requires a plaintiff to identify the time and place of the alleged predicate acts, see Graue Mill, 927 F.2d at 992; accord Feinstein v. Resolution Trust Corp., 942 F.2d 34, 42 (1st Cir.1991) (dismissing RICO complaint for failure to plead predicate acts with specificity), and Midwest failed to do so here. Second, Midwest, not the defendants, had peculiar access to the invoices on which the undercharging scheme was based: Spitz sent those invoices while employed at Midwest and Midwest presumably retained those business records. Finally, it is unclear from Midwest's vague averments on this issue whether all or only some invoices sent to Cardinal in 1985 and 1986 reflected this fraudulent charging scheme.
 
 
 14
 Alternatively, Midwest maintains that the district court erred in denying it leave to correct this pleading deficiency. We disagree. The district court's decision to deny leave to file a third amended complaint is firmly within its sound discretion, Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), and we will overturn it only if Midwest can show that the court acted without justification. J.D. Marshall Int'l, Inc. v. Redstart, Inc., 935 F.2d 815, 819 (7th Cir.1991); Otto v. Variable Annuity Life Ins. Co., 814 F.2d 1127, 1139 (7th Cir.1986), cert. denied, 486 U.S. 1026, 108 S.Ct. 2004, 100 L.Ed.2d 235 (1988). This, Midwest cannot do. Midwest had fair notice of its pleading deficiencies from the defendants' motion to dismiss, but it chose to ignore that warning. Hayduk v. Lanna, 775 F.2d 441, 445 (1st Cir.1985) (dismissal with prejudice is proper where plaintiff has notice of deficiencies in complaint and fails to correct them in an amended complaint); Denny v. Barber, 576 F.2d 465, 471 (2d Cir.1978) (same). Accordingly, the district court was justified in denying leave to file a third amended complaint.
 
 B.
 
 15
 Midwest also challenges the district court's decision to dismiss the allegations of a cover-up scheme. The district court relied principally on Jones v. Lampe, 845 F.2d 755 (7th Cir.1988), which, as here, involved allegations that cover-up activities constituted RICO predicate acts. The defendant bank in Jones sent fraudulent bank statements to the Small Business Administration to cover-up an earlier misappropriation of funds. We concluded that this cover-up was part of a single-transaction scheme to defraud, leading us to find that the bank had not engaged in a pattern of racketeering. "If we were to treat every alleged 'cover-up' as a separate scheme, every transaction could turn into a 'multiple scheme' if the defendant denies wrongdoing." Id. at 759; see also SK Hand Tool Corp. v. Dresser Indus., Inc., 852 F.2d 936, 946 n. 8 (7th Cir.1988), cert. denied, 492 U.S. 918, 109 S.Ct. 3241, 106 L.Ed.2d 589 (1989). The district court in the instant case followed that approach, concluding that the alleged cover-up activities failed to amount to a separate scheme to defraud.
 
 
 16
 Midwest argues that Jones is (somehow) distinguishable from the case at bar. That intuition is correct. Although Jones teaches that cover-up activity is part of the underlying scheme to defraud, rather than a separate, freestanding scheme, it is silent on the issue here: whether the defendants' purported cover-up activities can serve as predicate acts in the overall pattern of racketeering.[2] For starters, we know that telling a lie or committing perjury is not per se a RICO predicate act for one simple reason: it is not included among the list of predicate acts in 18 U.S.C. § 1961(1). See Pyramid Sec., Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1117 (D.C.Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 85, 116 L.Ed.2d 57 (1991); Rand v. Anaconda-Ericsson, Inc., 623 F.Supp. 176, 182 (E.D.N.Y.1985), aff'd on other grounds, 794 F.2d 843, 849 (2d Cir.1986), cert. denied, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); Sellers v. General Motors Corp., 590 F.Supp. 502, 507 (E.D.Pa.1984); but see Kearny v. Hudson Meadows Urban Renewal Corp., 829 F.2d 1263, 1269 (3d Cir.1987) (dicta) (perjury can be a predicate act under RICO). However, that does not necessarily doom Midwest's argument. If Midwest can show that the defendants' lies constituted mail or wire fraud, 18 U.S.C. §§ 1341 and 1343, or an obstruction of justice, 18 U.S.C. § 1503, then those cover-up acts theoretically may serve as predicate acts. See C & W Constr. Co. v. Brotherhood of Carpenters and Joiners, Local 745, 687 F.Supp. 1453, 1467 (D.Haw.1988) ("The more reasoned rule would allow perjury to be a predicate act under 18 U.S.C. § 1962(1), through 18 U.S.C. § 1503, where the plaintiffs allege that the perjury was part of the pattern of racketeering."); see also South Chicago Bank v. Notaro, 1991 WL 21185, 1991 U.S. Dist. LEXIS 1602 (N.D.Ill. Feb. 11, 1991) (mailing false financial statements during litigation might be considered predicate acts if mailings proximate cause of RICO injury); Levit v. Brodner, 75 B.R. 281, 285 (N.D.Ill.1987) (perjury and destruction of evidence in bankruptcy action might serve as predicate act in subsequent RICO suit).
 
 
 17
 Here, Midwest asserts that the defendants attempted to cover up Spitz's involvement with U.S. Grinding by making false statements in depositions and requests to admit. For example, Spitz and Grunfeld denied under oath that they went to Michigan together to acquire machinery for U.S. Grinding. After evidence surfaced that they did in fact make such a trip, Spitz and Grunfeld recanted this position in subsequent testimony. Midwest contends that the responses to their requests to admit, which were sent through the mails, constituted mail fraud and, therefore, can serve as predicate acts. As for the false deposition statements--which, apparently, never made it into the mails--Midwest belatedly suggests in its reply brief that these false statements might constitute an obstruction of justice and therefore serve as predicate acts. Appellant's Reply Br. at 27 n. 16. Based on these predicate acts, Midwest argues that the cover-up allegations should have survived the defendants' motion to dismiss. We need not decide that issue because, as we discuss more fully below, even assuming the defendants' deeds qualify as predicate acts,[3] Midwest still fails to show the requisite pattern of racketeering.
 
 III.
 
 18
 Midwest's final contention is that the district court erred in finding no pattern of racketeering. The RICO statute says precious little about what constitutes a pattern of activity. 18 U.S.C. § 1961(5) (pattern is two or more predicate acts committed within a ten-year period). Given RICO's generous civil awards, that amorphous definition has lead (not surprisingly) to widespread attempts to turn routine commercial disputes into civil RICO actions. In response, the Supreme Court has attempted to give definition to the pattern requirement to forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law. H.J., Inc., 492 U.S. at 240-41, 109 S.Ct. at 2901-02; Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14; see also Barticheck v. Fidelity Union Bank, 832 F.2d 36, 38 (3d Cir.1987) (Sedima dictum "has been widely viewed as a signal to the federal courts to fashion a limiting construction of RICO's ... pattern requirement"); Bart Karwath, Has the Constituency of Continuity Plus Relationship Put an End to RICO's Pattern of Confusion?, 18 Am.J.Crim.L. 201 (1991) (discussing the status of RICO's pattern requirement among the circuits). To that end, a civil RICO plaintiff may no longer get by merely alleging two predicate acts, but must also satisfy the so-called "continuity plus relationship" test: the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong). H.J., Inc., 492 U.S. at 239, 109 S.Ct. at 2900; Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.
 
 
 19
 We limit our discussion to the continuity prong of this test because all parties agree that the relationship prong is satisfied here. Continuity is "both a closed- and open-ended concept." H.J., Inc. 492 U.S. at 241, 109 S.Ct. at 2902. As its label suggests, a "closed-ended" period of racketeering activity involves a course of criminal conduct which has come to a close. To satisfy the continuity element in a closed-ended case, the plaintiff must prove a series of related predicates enduring a "substantial period of time." Id. at 242, 109 S.Ct. at 2902. The underlying rationale is that the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future.
 
 
 20
 An open-ended period of racketeering, by contrast, is a course of criminal activity which lacks the duration and repetition to establish continuity. A RICO plaintiff may still satisfy the continuity requirement in that situation, however, by showing past conduct which "by its nature projects into the future with a threat of repetition." Id. Such a threat of continuity exists when the plaintiff can show (1) a "specific threat of repetition," (2) that the "predicate acts or offenses are part of an ongoing entity's regular way of doing business," or (3) that the defendant operates a "long-term association that exists for criminal purposes." Id. at 242-43, 109 S.Ct. at 2902; see also Comment, H.J., Inc.: Targeting Federal RICO's Pattern Requirement to Long Term Criminal Activity, 51 Ohio St.L.J. 713, 733-739 (1990). In sum, a RICO plaintiff can prevail by either (1) demonstrating a closed-ended conspiracy that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended conspiracy that, while short-lived, shows clear signs of threatening to continue into the future. Applying the above analysis, the district court determined that, despite its earlier conclusion finding a sufficient pattern, in light of H.J., Inc., a different result was now warranted. The court granted summary judgment to the defendants,[4] holding that Midwest failed to show continuity because the defendants' activities were closed-ended, had occurred over a short period of time, and posed no threat of future activity.
 
 
 21
 Midwest disputes this determination, and maintains that the defendants' racketeering activity satisfies continuity under either an open-ended or closed-ended analysis. We disagree. First, there is absolutely no "specific threat of repetition" in the future for one obvious reason: once Spitz went to work for U.S. Grinding, he was perfectly free to compete with Midwest for customers and employees. Absent a non-competition or confidentiality clause, Spitz owed no duty to Midwest; thus, the alleged scheme to fraudulently divert business and employees to U.S. Grinding ceased to exist in August 1986 when Spitz left Midwest. Second, Midwest has failed to present any evidence that the predicate acts here are part of the defendants' "regular way of doing business," or that Spitz and Grunfeld routinely raided competitors in this fashion.
 
 
 22
 Clement Communications, Inc. v. American Future Systems, Inc., 1990 WL 106762, 1990 U.S. Dist. LEXIS 9165 (E.D.Pa. July 19, 1990), is instructive. There, the plaintiff sued several former employees for disclosing company trade secrets. The district court dismissed the RICO suit after finding a close-ended scheme with no threat of future harm. "Once the defendants left Clement's employ and put his trade secrets to work in their own business, the harm to Clement was done and the scheme ended." Id., 1990 WL 106762, at *6, 1990 U.S. Dist. LEXIS 9165, at * 16; see also Thompson v. Paasche, 950 F.2d 306, 311 (6th Cir.1991) (where defendant's access to the instrumentality of fraud ceases to exist, scheme is necessarily closed-ended); Biddle Sawyer Corp. v. Charkit Chem. Corp., 1991 WL 60369, at *4, 1991 U.S. Dist. LEXIS 4599, at * 11 - 12 (S.D.N.Y. Apr. 2, 1991) (dismissing RICO claim based upon diversion of business from the defendant's former employer to present employer).
 
 
 23
 Having concluded this was a closed scheme does not end the matter, however, since a scheme that has ceased to exist still exhibits continuity if the predicates "extend[ed] over a substantial period of time" and threaten to recur in the future. H.J., Inc., 492 U.S. at 242, 109 S.Ct. at 2902. In making that determination, we are aided by the multifactor continuity test outlined in Morgan v. Bank of Waukegan, 804 F.2d 970, 975 (7th Cir.1986), which survives H.J., Inc. See Olive Can Co., Inc. v. Martin, 906 F.2d 1147, 1151 n. 2 (7th Cir.1990) (Morgan approach fully consistent with teaching of H.J., Inc.). According to Morgan, continuity is a function of the duration of time over which the predicate acts were committed, the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. Morgan, 804 F.2d at 975.
 
 
 24
 The first factor, duration, is perhaps the closest thing we have to a bright-line continuity test: the "predicate acts" must "extend[ ] over a substantial period of time"; "a few weeks or months" is considered insubstantial. H.J., Inc., 492 U.S. at 242, 109 S.Ct. at 2902. Here, the effort to divert Midwest's customers and employees was a one-shot scheme that lasted, at most, nine months, from the time Spitz and Grunfeld began doing the groundwork to establish U.S. Grinding (December 1985) to the time Spitz resigned (August 1986).[5] See Talbot v. Robert Matthews Distrib. Co., 961 F.2d 654, 663 (7th Cir.1992) (no pattern where single scheme occurred over period of years); J.D. Marshall, 935 F.2d at 819 (same over thirteen-month period); U.S. Textiles, 911 F.2d at 1266 (sixteen-month period); Hartz v. Friedman, 919 F.2d 469, 473 (7th Cir.1990) (eighteen-month period); New Burnham Prairie Homes v. Village of Burnham, 910 F.2d 1474, 1478 (7th Cir.1990) (several years); Short v. Belleville Shoe Mfg. Co., 908 F.2d 1385, 1393 (7th Cir.1990) (four-to five-month period), cert. denied, --- U.S. ----, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991); Olive Can, 906 F.2d at 1148-49 (six-month period); Management Computer Serv., Inc. v. Hawkins, Ash, Baptie & Co., 883 F.2d 48, 50 (7th Cir.1989) (several months); Sutherland v. O'Malley, 882 F.2d 1196, 1204 (7th Cir.1989) (five-month period).
 
 
 25
 As for the alleged cover-up scheme whose resolution we left hanging, see supra, at 1022, even if we assume actions to hide Spitz's involvement with U.S. Grinding qualify as predicate acts, they do nothing to extend the duration of the underlying diversion scheme. See Pyramid Sec., 924 F.2d at 1117 (scheme to conceal underlying criminal activity by giving false deposition testimony does not extend the length of a closed-ended RICO scheme); see also Aldridge v. Lily-Tulip, Inc., 953 F.2d 587, 593-04 (11th Cir.1992) (acts to conceal underlying wrongdoing in a RICO suit do not carry with them the threat of future harm). A conspiracy ends when the design to commit substantive misconduct ends; it does not continue beyond that point "merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished." Grunewald v. United States, 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957). Although Grunewald "holds open the possibility that concealment could extend a conspiracy if the conspirators expressly plotted in advance of the substantive crimes," Pyramid Sec., 924 F.2d at 1117, not a trace of evidence supports such a finding here.[6]
 
 
 26
 The second factor, the number and variety of predicate acts, is also lacking here. The predicate acts consisted primarily of hundreds of invoices sent through the mails to former Midwest customers.[7] Although the sheer number of predicate acts might appear at first glance to prove continuity, when it comes to a pattern premised on acts of mail or wire fraud, the volume of mailings is not dispositive. See U.S. Textiles, 911 F.2d at 1266. Indeed, mail and wire fraud allegations "are unique among predicate acts" because multiplicity of such acts "may be no indication of the requisite continuity of the underlying fraudulent activity." Id. Consequently, we do "not look favorably on many instances of mail and wire fraud to form a pattern." Hartz, 919 F.2d at 473; see also Talbot, 961 F.2d at 663 (no pattern where single scheme involved multiple acts of mail fraud causing identical injury); Olive Can, 906 F.2d at 1151 (same); Sutherland, 882 F.2d at 1205 n. 8 (same); Ashland Oil, Inc. v. Arnett, 875 F.2d 1271, 1278 (7th Cir.1989) (same). While this scheme involved a considerable number of invoices, the bulk of them were directed to a few customers and were very similar to one another. Consequently, the sizable number of mailings does not show that the defendants operated a long-term criminal operation.
 
 
 27
 The remaining Morgan factors also militate against a finding of continuity. There was only one victim (Midwest), see, e.g., J.D. Marshall, 935 F.2d at 819, one scheme (the diversion of customers and employees from Midwest to U.S. Grinding), see, e.g., Sutherland, 882 F.2d at 1204 (no pattern where defendant engaged in a "one-shot" effort to inflict injury), and one type of injury (loss of business). See, e.g., U.S. Textiles, 911 F.2d at 1269. This closed-ended scheme has none of the trappings of a long-term criminal operation that carries with it a threat to society; it is, in short, a run-of-the mill fraud case that belongs in state court. If Spitz really did send customers and employees to U.S. Grinding while serving as Midwest's president, he undoubtedly breached his fiduciary duty to the company. But the moment he resigned from Midwest, he was free to join a competitor in the metal grinding business and to solicit Midwest's customers and employees. It follows that once Spitz left Midwest, any threat of future illegal activity ceased to exist. See Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1516 (10th Cir.1990) (no threat of future illegal activity following abandoned business deal); Cullen v. Paine Webber Group, Inc., 689 F.Supp. 269, 275 (S.D.N.Y.1988) (defendants' scheme to steal clients from plaintiff had clear terminating point and carried no threat of future harm).
 
 
 28
 Despite the fact that we have yet to confront a civil RICO case that satisfies H.J., Inc.'s continuity test, see supra, at 1024 (citing all post-H.J., Inc. Seventh Circuit cases), civil RICO plaintiffs persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions. While it is clear that the scope of civil RICO extends beyond the prototypical mobster or organized crime syndicate, H.J., Inc., 492 U.S. at 248-49, 109 S.Ct. at 2905, it is equally evident that RICO has not federalized every state common-law cause of action available to remedy business deals gone sour. See generally Jed S. Rakoff, Some Personal Reflections on the Sedima Case and on Reforming RICO, in RICO: Civil and Criminal 400 (1984).
 
 
 29
 The widespread abuse of civil RICO stems from the fact that all modern business transactions entail use of the mails or wires--giving plaintiffs a jurisdictional hook--and the fact that RICO offers a far more generous compensation scheme than typically available in state court. See Sedima, 473 U.S. at 479, 105 S.Ct. at 3275 (Marshall, J., dissenting); see also Paul A. Batista, Civil RICO Practice Manual 1-2 (1987) (discussing the outlandish uses to which civil RICO has been put); cf. Diamond, Steep Rise in Private Use of Federal Racketeering Law, N.Y. Times, Aug. 1, 1988, at 1, col. 5 (reporting a fifty-fold increase in civil RICO suits during the 1980s). H.J., Inc. responded to that abuse by refocusing the pattern requirement on the sort of long-term criminal activity that carries some quantum of threat to society; the evidence here falls short of that mark. We agree with the district court's apt characterization of this action: "At its most basic level, this is a purely private business dispute between Spitz and Midwest; moreover, that dispute is occasioned solely by their previously existing business relationship. Congress did not have such a dispute in mind in fashioning the civil treble damage remedy to the federal RICO statute." Midwest Grinding, 769 F.Supp. at 1470; see also U.S. Textiles, 911 F.2d at 1266 (only a party engaging in widespread fraud should be subject to treble damages); accord Marshall-Silver Constr. Co. v. Mendel, 894 F.2d 593, 597 (3d Cir.1990); Menasco, Inc. v. Wasserman, 886 F.2d 681, 683 (4th Cir.1989). Midwest may very well have a case against Spitz for breach of duty or tortious interference with business relationships; it has absolutely no case against him, however, for a civil RICO violation.
 
 
 30
 A few loose ends: First, the § 1962(d) RICO conspiracy claim is also premised on the existence of a pattern of racketeering; therefore, we need not further address that issue or Grunfeld's dismissal from the suit as a co-conspirator. Second, because we conclude the district court properly granted the defendants' motion for summary judgment, we need not consider the defendants' cross-appeal on the motion to dismiss. Third, because the only basis for federal jurisdiction was disposed of before trial, the district court properly dismissed the remaining pendent state-law claims. See, e.g., Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n, 805 F.2d 663, 682 (7th Cir.1986), cert. denied, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). Finally, we deny the defendants' motion to strike Midwest's reply brief for violating page limits through excessively long footnotes.
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 18 U.S.C. § 1962(c) makes it unlawful
 for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 Section 1962(d) makes it unlawful for any person to conspire to violate §§ 1962(a), (b), and (c). The original complaint also asserted claims under §§ 1962(a) and (b) of RICO, which the district court dismissed and Midwest has since abandoned.
 
 
 [2]
 The multiple versus single scheme analysis in Jones was part of a larger debate among courts over what constitutes a pattern of racketeering. Some courts thought two or more predicate acts did the trick, others thought it required two or more separate schemes, each comprised of predicate acts. The Supreme Court resolved this dispute in H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 236, 240, 109 S.Ct. 2893, 2898, 2901, 106 L.Ed.2d 195 (1989), rejecting a multiple scheme requirement. Therefore, our holding in Jones, while perhaps still relevant to our analysis regarding patterns of racketeering, says nothing about whether cover-up activities might constitute predicate acts
 
 
 [3]
 This is a generous assumption: it is far from clear these cover-up activities rise anywhere close to the level of mail fraud or obstruction of justice. In other cases allowing perjury to serve as a predicate act, for example, the defendant had either been convicted of perjury before the civil RICO action commenced, Kearny, 829 F.2d at 1269; C & W Constr., 687 F.Supp. at 1467, or had perjury established as a matter of record in a separate proceeding, Levit, 75 B.R. at 285, neither of which occurred here
 
 
 [4]
 The district court was "mystified," Midwest Grinding, 769 F.Supp. at 1462 n. 7, at Midwest's failure, in responding to the defendants' motion for summary judgment, to address the Supreme Court's intervening decision in H.J., Inc
 
 
 [5]
 Actually, the pattern lasted only three to four months. The district court determined that it began in December 1985, when in fact the first predicate act of mail fraud directly affecting Midwest did not occur until April or May of 1986
 
 
 [6]
 Midwest alleges the threat of harm continues because after Spitz left its employ, he left "moles" behind who continued to supply him with inside information. Even assuming the truth of that assertion, Midwest fails to show how this would qualify as a predicate act under 18 U.S.C. § 1961(1)
 
 
 [7]
 Midwest's complaint also contained conclusory allegations of wire fraud. The federal wire fraud statute extends only to interstate communications, 18 U.S.C. § 1343, and the district court dismissed these allegations for lack of specificity under Rule 9(b). Midwest Grinding, 716 F.Supp. at 1093. Midwest did not appeal that ruling