**BRANDON APPAREL GROUP, INC., Plaintiff,**

v.

**QUITMAN MANUFACTURING COMPANY, INC., Defendant.**

Quitman Manufacturing Company, Inc., Counter-claimant,

v.

Brandon Apparel Group, Inc., Bradley Keywell, and Eric Lefkofsky, Counter-defendants.

No. 98 C 7146.

United States District Court, N.D. Illinois, Eastern Division.

June 28, 1999.

John A. Sopuch, J. Jeffrey Nouhan, Sopuch, Nouhan, Higgins & Arnett, LLP, Chicago, IL, for plaintiff.

Shayle P. Fox, John T. Martin, Fox and Grove, Chartered, Chicago, IL, David E. Mullis, Smith & Mullis, Valdosta, GA, for defendant.

### MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court is counter-defendants Brandon Apparel Group, Inc., Bradley Keywell, and Eric Lefkofsky's motion to dismiss Counts I–IV of counter-claimant Quitman Manufacturing Company's counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the court grants the motion to dismiss as to Counts I–III and denies the motion as to Count IV.

### I. BACKGROUND

#### A. Procedural history

Brandon Apparel Group ("Brandon") is a manufacturer and distributor of licensed apparel that is embroidered with the logos of various athletic teams. Quitman Manufacturing Company ("Quitman") is a manufacturer of sports apparel. On November 6, 1998, Brandon filed suit against Quitman in this court, asserting claims for breach of contract, fraud and misrepresentation, and unjust enrichment. This court has subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1332 as there exists complete diversity between the parties and the amount in controversy exceeds $75,000.

In response to Brandon's complaint, Quitman filed a motion to dismiss for lack of personal jurisdiction, to dismiss for improper venue, or, alternatively, to transfer the case pursuant to 28 U.S.C. § 1404(a). The court denied Quitman's motion and ordered Quitman to file an answer to Brandon's first amended complaint. *Brandon Apparel Group, Inc. v. Quitman Mfg. Co.*, 42 F.Supp.2d 821 (N.D.Ill. 1999).

On April 9, 1999, Quitman filed an answer to Brandon's first amended complaint. Quitman also filed a counterclaim, naming Brandon, Bradley Keywell ("Keywell"), and Eric Lefkofsky ("Lefkofsky") as counter-defendants. Keywell and Lefkofsky are officers of Brandon. The counterclaim contains eight counts: Counts I–III are claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; Count IV is a claim for fraud; Count V and VI are claims for breach of contract; Count VII is a claim for conversion; and Count VIII is a claim for unjust enrichment.

On May 20, 1999, Brandon, Keywell, and Lefkofsky jointly filed a motion to dismiss Counts I–IV of Quitman's counterclaim.

It is this motion that is currently before the court.

## B. *Allegations in Quitman's counter-claim*

Quitman's counterclaim makes the following allegations which, for the purpose of ruling on this motion to dismiss, are taken as true.[1] In late 1997 and early 1998, representatives from Brandon and Quitman engaged in conversations relating to the possibility of Brandon and Quitman doing business together, the ability of Quitman to meet Brandon's production needs, and the possibility of the two companies merging. On March 16, 1998, Brandon sent Quitman a list of various items that Brandon expected to sell in the Fall of 1998. After a Quitman representative told Brandon that Quitman was ready to begin producing sports apparel for Brandon, Brandon sent Quitman many purchase orders. At its Georgia production facility, Quitman began producing the apparel ordered by Brandon.

In May of 1998, Brandon suggested that Brandon guarantee payment for the clothing being manufactured for it by Quitman via a factoring agreement involving Brandon's business with Montgomery Wards ("Wards"). Brandon told Quitman that Wards was a client with whom Brandon had ongoing business. Pursuant to the factoring agreement, Brandon would direct Wards to send to Quitman or Quitman's factor the payments which Wards owed to Brandon. In order to induce Brandon to enter into the factoring agreement, Brandon representatives knowingly made the following false and fraudulent statements: On June 29, 1998, Lefkofsky told Quitman via an interstate wire communication that during July of 1998, Brandon would be sending Wards approximately $300,000 worth of merchandise and that Wards' payment for the merchandise could be factored through Quitman. In July of 1998, Keywell represented to Quitman via an interstate wire communication that Bran-

don would be doing approximately $1,000,-000 worth of business with Wards between July and December of 1998 and that Wards' payments to Brandon could be factored through Quitman.

Based on Keywell's and Lefkofsky's representations, Brandon and Quitman entered into the factoring agreement involving the Wards business. The factoring agreement provided that Brandon would direct Wards to pay invoices owed to Brandon to a factor account for Quitman established at Sun Trust Bank. The money paid was to serve as collateral to ensure that Brandon paid Quitman for the merchandise. Brandon, Keywell, and Lefkofsky each knew that the factoring agreement was actually a part of their scheme to defraud Quitman and Wards.

In reliance on the factoring agreement and a $50,000 letter of credit obtained by Brandon on behalf of Quitman, Quitman made many shipments of goods in July of 1998. On August 4, 1998, Quitman requested Brandon to issue the $50,000 letter of credit along with written authorization to offset payment owed by Brandon to Quitman with money collected pursuant to the factoring agreement. On August 17, 1998, Keywell authorized Quitman to offset the payment due with the money from the factoring agreement even through Keywell knew that Wards was being double billed by Brandon for the invoices. Keywell also issued the letter of credit on August 20, 1998.

In reliance on the factoring agreement, Brandon's ongoing assurances, and the $50,000 letter of credit, Quitman made many more shipments to Brandon in the month of August of 1998. On August 21, 1998, Quitman told Brandon that it owed Quitman $419,270.60 and that the Wards' invoices provided to Quitman only totaled $186,970.67. On August 25, 1998, Lefkofsky and Keywell denied the earlier agreements to provide collateral and told Quitman that it owed Brandon for fabric that

---

1. Of the extensive allegations contained in Quitman's counterclaim, the court only re-

cites those allegations that are relevant to the current motion to dismiss.

was to be used in Brandon garments. Quitman agreed to offset Brandon's outstanding balance by the $32,626.96 invoice for the fabric.

During the months of August through early October of 1998, the parties continued to haggle back and forth about goods to be shipped by Quitman to Brandon and outstanding balances owed by Brandon to Quitman. Quitman continued to ship goods to Brandon after receiving money from either the factoring agreement or interstate wire transfers of funds.

In October of 1998, the relationship between the parties fell apart. Beginning on October 6, 1998 and continuing until the present time, Brandon refused to wire any additional money to Quitman and refused to factor enough Wards' invoices to cover the scheduled shipments. At least two times during October, Quitman was forced to transfer money collected pursuant to the factoring agreement to cover unpaid invoices owed by Brandon to Quitman. Quitman continues to hold orders in the amount of $78,750 for which Brandon refuses to pay and $35,000 worth of raw materials that is useless to Quitman.

## II. *DISCUSSION*

### A. *Standard for deciding a Rule 12(b)(6) motion to dismiss*

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Cromley v. Board of Educ. of Lockport,* 699 F.Supp. 1283, 1285 (N.D.Ill.1988). If, when viewed in the light most favorable to the plaintiff, the complaint fails to state a claim upon which relief can be granted, the court must dismiss the case. *See* Fed.R.Civ.P. 12(b)(6); *Gomez v. Illinois State Bd. of Educ.,* 811 F.2d 1030, 1039 (7th Cir.1987). However, the court may dismiss the complaint only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. *Quitman's RICO claims*

Counts I–III contain claims against Brandon, Keywell and Lefkofsky for violations of sections 1962(a), 1962(c), and 1962(d) of RICO. Brandon has moved to dismiss these counts, arguing that Quitman has failed to allege the requisite "pattern of racketeering activity."

■ A "pattern of racketeering activity" is an essential element to any RICO claim. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 232, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Goren v. New Vision Int'l Inc.,* 156 F.3d 721, 727, 732 (7th Cir.1998); *Corley v. Rosewood Care Ctr., Inc. of Peoria,* 142 F.3d 1041, 1048 (7th Cir.1998). Insufficiently pleading the "crucial" element of pattern of racketeering activity "rings the death knell" for RICO claims under § 1962. *J.D. Marshall Int'l, Inc. v. Redstart, Inc.,* 935 F.2d 815, 820 (7th Cir.1991).

RICO defines "racketeering activity" to include, *inter alia,* any act indictable under specified provisions of the United States Code, including 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). *Corley,* 142 F.3d at 1048. However, while RICO clearly defines what constitutes "racketeering activity," RICO "is not particularly helpful in defining the all-important pattern requirement, as it notes only that a pattern requires at least two acts of racketeering activity within a ten year period." *Id.*

■ Because RICO does not clearly define what satisfies the pattern requirement, the Supreme Court of the United States and the Seventh Circuit have attempted to provide guidelines as to what constitutes a "pattern of racketeering activity." First, the Supreme Court has noted that although two predicate acts of racketeering are necessary to form a pattern, two acts alone generally will not suffice. *H.J. Inc.,* 492 U.S. at 237, 109 S.Ct. 2893. Rather, in addition to at least two

predicate acts, the plaintiff must show that the predicate acts are (1) related and (2) amount to or pose a threat of continued criminal activity. *Id.* This is commonly referred to as the "continuity plus relationship" test. *LaSalle Bank Northbrook v. Baker,* No. 94 C 3827, 1994 WL 630705, at *2 (N.D.Ill. Nov.9, 1994).

In this case, counter-defendants argue that Quitman has not stated a RICO claim because Quitman has failed to allege the requirement of continuity. It is on the requirement of continuity, therefore, that this court focuses.

■ With respect to the requirement of continuity, the Supreme Court has stated: " 'Continuity' is both a closed- and open-ended concept, referring to either a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. 2893. Thus, continuity is "centrally a temporal concept." *Id.* at 242, 109 S.Ct. 2893. Because allegations of conduct that can be characterized as either closed-ended or open-ended are sufficient to allege the requirement of continuity, the court will examine whether the conduct alleged in Quitman's counterclaim satisfies either standard.

### 1. Closed-ended continuity

■ "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893. According to the Supreme Court, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.*

■ There are several factors the court must consider in determining whether the plaintiff has alleged closed-ended continuity. *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986); *see also Corley,* 142 F.3d at 1049 (stating that the

Seventh Circuit has continued to look to the *Morgan* factors after the Supreme Court's decision in *H.J. Inc.*). These factors include: (1) the number and variety of predicate acts; (2) the length of time over which the predicate acts were committed; (3) the number of victims; (4) the presence of separate schemes; and (5) the occurrence of distinct injuries. *Morgan,* 804 F.2d at 975. Neither the presence nor absence of any of these factors is dispositive. *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.,* 63 F.3d 516, 523 (7th Cir.1995). The court must "apply these factors with an eye toward achieving a 'natural and commonsense' result, recognizing that 'Congress was concerned in RICO with long-term criminal conduct.' " *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 780 (7th Cir.1994). With this in mind, the court examines each of these factors in turn.

### a. The number and variety of predicate acts

The first factor that the court must consider is the number and variety of predicate acts. To do this, the court must first determine what predicate acts the court can consider. According to Quitman, the alleged predicate acts consist of many instances of mail fraud, wire fraud, and bank fraud. According to counter-defendants, there are only three or four predicate acts which the court can consider because those are the only alleged acts that meet the requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)").

■ In alleging the predicate acts on which the RICO claim relies, the RICO plaintiff must satisfy the requirements of Rule 9(b). *Corley,* 142 F.3d at 1050. Rule 9(b) requires that "[i]n all averments of fraud ... the circumstances constituting the fraud or mistake shall be stated with particularity." FED.R.CIV.P. 9(b). The Seventh Circuit has repeatedly instructed that Rule 9(b) requires the plaintiff to plead in detail the "who, what, when, where, and how" of the circumstances con-

stituting the fraud. *E.g., DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). In other words, the plaintiff must plead in detail the "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *E.g., Corley,* 142 F.3d at 1050; *Vicom,* 20 F.3d at 777; *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 924 (7th Cir. 1992).

Examining the complaint, the court finds that Quitman, at best, has alleged only three predicate acts with sufficient particularity. These are (1) Lefkofsky's wire communication to Quitman on June 29, 1998, (Countercl.¶¶ 23–24); (2) Keywell's wire communication to Quitman in July of 1998, (Countercl.¶¶ 23–24); and (3) Keywell's authorization to use money collected from the factoring agreement, (Countercl.¶ 33). Although Quitman makes general claims that there are many instances of wire, mail, and bank fraud, Quitman has failed to allege those predicate acts with sufficient particularity. Accordingly, the court will not consider those alleged predicate acts. *See Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1328 (7th Cir.1994) (holding that plaintiff's allegations that defendant engaged in "multiple instances" of mail and wire fraud did not allege a "pattern of racketeering activity" with sufficient particularity).

██ Having determined what predicate acts that the court can consider, the court must now consider the number and variety of those predicate acts. The sheer number of predicate acts is not dispositive of continuity. *LaSalle Bank Northbrook,* 1994 WL 630705, at \*4. In addition, the Seventh Circuit "does not look favorably on relying on many instances of mail and wire fraud to form a pattern." *Hartz v. Friedman,* 919 F.2d 469, 473 (7th Cir. 1990).

In this case, there are only three alleged predicate acts that the court can consider, which is minimal amount. In addition, two of those acts are only wire fraud. Accordingly, the court finds that the number and

variety of predicate acts weighs against a finding that Quitman has sufficiently alleged a "pattern of racketeering activity."

**b. The length of time over which the predicate acts were committed**

██ The next factor that the court must consider is the length of time over which the predicate acts were committed. Duration is the "single most important aspect of the closed-ended continuity analysis" and "is perhaps the closest thing [the Seventh Circuit] has to a brightline continuity test." *Vicom,* 20 F.3d at 780–81. The predicate acts must extend over a "substantial" period of time; a few weeks or months is considered insubstantial. *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1024 (7th Cir.1992).

In this case, the alleged predicate acts took place at most over a three-month period. Although the Seventh Circuit has never developed a bright-line test as to what constitutes a "substantial period of time," Seventh Circuit case law shows that three months likely does not constitute a substantial period of time for the purpose of establishing closed-ended continuity. *Vicom,* 20 F.3d at 780 (holding that a time period of less than nine months is not a substantial period of time for the purposes of closed-ended continuity); *Uni\*Quality,* 974 F.2d at 922 (finding that a time period of seven to eight months is not a substantial period of time); *J.D. Marshall Int'l,* 935 F.2d at 821 (finding that a time period of thirteen months is not a substantial period of time); *Midwest Grinding,* 976 F.2d at 1024 (finding that a period of nine months is not a substantial period of time and cataloguing Seventh Circuit cases and time frames); *see also Corley,* 142 F.3d at 1049 (stating that a closed-ended period of twelve to fourteen months would have considerable difficulty satisfying the requirement of continuity). In fact, Quitman did not cite, and the court could not find, a case from the Seventh Circuit where the court found that closed-ended continuity existed where the predicate acts took place

over only a three-month period of time. Accordingly, the court finds that Quitman's counterclaim fails to allege that the predicate acts took place over a "substantial period of time."

### c. The number of victims

The next factor that the court must consider is the number of victims involved in the scheme. RICO does not require multiple victims; however, whether there are multiple victims is highly relevant to the inquiry of continuity. *LaSalle Bank Northbrook*, 1994 WL 630705, at *4. The consideration of the number of victims, however, in no way is dispositive of whether the predicate acts alleged in the counterclaim can support a finding that continuity exists. *Vicom*, 20 F.3d at 781.

Counter-defendants argue that Quitman is the sole alleged victim. Quitman contends that there are three victims: Quitman, Wards, and Sun Trust Bank. Quitman has failed to offer a convincing explanation of how Sun Trust Bank was victimized by the alleged scheme. Accordingly, the court finds that the counterclaim has, at most, alleged two victims of the fraudulent scheme: Quitman and Wards.

### d. The presence of separate schemes

The next factor that the court must consider is the presence of separate schemes. As with multiple victims, RICO does not require multiple schemes; however, whether there are multiple schemes is highly relevant to the inquiry of continuity. *LaSalle Bank Northbrook*, 1994 WL 630705, at *4. However, the court cannot conclude that the pattern requirement has not been satisfied only because the plaintiff has alleged only one scheme. *H.J. Inc.*, 492 U.S. at 235, 109 S.Ct. 2893.

Despite its attempts to argue otherwise, Quitman has in effect alleged only one fraudulent scheme: that Brandon double billed Wards to make it look like Brandon had more collateral to ensure that Quitman would continue to manufacture goods for Brandon. All of the alleged misrepresen-

tations and fraudulent activity revolve around this one main scheme. Accordingly, this factor weighs against a finding of a "pattern of racketeering activity."

### e. The occurrence of distinct injuries

The final factor that the court must consider is the occurrence of distinct injuries. The question is "whether each of these injuries was 'distinct' in the sense that it signaled, or by itself constituted, a threat of 'continuing' criminal activity." *U.S. Textiles, Inc. v. Anheuser–Busch Co.*, 911 F.2d 1261, 1269 (7th Cir.1990). A distinct injury is a different type of injury; it is not multiple instances of the same injury. *LaSalle Bank Northbrook*, 1994 WL 630705, at *4.

Quitman attempts to argue that it suffered multiple injuries from the fraudulent scheme. However, as with the alleged predicate acts, Quitman has failed to explain what that injury was. In the end, the only injury that Quitman has alleged is that it has not been paid for certain goods that it manufactured for Brandon. This is only one type of injury. Accordingly, the court finds that this factor weighs against a finding that Quitman has sufficiently alleged a "pattern of racketeering activity."

### f. Conclusion on closed-ended continuity

In sum, while Quitman has alleged that there was more than one victim of Brandon's allegedly fraudulent scheme, Quitman has failed to allege facts to satisfy the other *Morgan* factors. At best, Quitman has alleged one fraudulent scheme that lasted for a few months, that involved only three predicate acts, and that involved only one type of injury. Accordingly, the court finds that Quitman has failed to allege a closed-ended pattern of racketeering activity.

### 2. Open-ended continuity

Having found that Quitman has failed to allege closed-ended continuity, the court now must determine whether Quit-

man has alleged open-ended continuity. In contrast to closed-ended continuity, open-ended continuity "may involve predicate acts occurring over a short period of time so long as there is a threat that the conduct will recur in the future." *Corley,* 142 F.3d at 1049. A plaintiff may allege open-ended continuity by sufficiently pleading (1) that there exists a specific threat of repetition; (2) that the predicate acts are a part of a legitimate business's regular way of conducting ongoing business; or (3) that the defendant operates a long-term association existing for criminal purposes. *Vicom,* 20 F.3d at 782 (citing *H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. 2893); *see also Midwest Grinding,* 976 F.2d at 1023.

In this case, Quitman has not attempted to allege, or even argue, that open-ended continuity is applicable in this case. Quitman has not alleged a specific threat of repetition. Moreover, Quitman has failed to allege that the predicate acts are a part of Brandon's way of conducting business. Finally, Quitman has not alleged that Brandon operates a long-term association existing for criminal purposes. Accordingly, the court finds that Brandon has failed to allege an open-ended pattern of racketeering activity.

### 3. Conclusion on the requirement of continuity

In sum, Quitman has failed to allege either closed-ended or open-ended continuity. Consequently, Quitman has failed to allege a "pattern of racketeering activity." In essence, this case, like so many other cases, is ultimately "a run-of-the-mill fraud case" and not a RICO case. *Midwest Grinding,* 976 F.2d at 1025. Accordingly, the court grants counter-defendants' motion to dismiss Counts I–III of Quitman's counterclaim.

### C. *Quitman's fraud claim*

Count IV is a claim against Brandon, Lefkofsky, and Keywell for fraud. Counter-defendants have moved to dismiss Count IV, arguing that Quitman cannot state a claim for promissory fraud under Illinois law. Quitman opposes the motion, arguing that counter-defendants have mischaracterized its claim as one for "promissory" fraud when, in fact, it is simply a fraud claim.

Under Illinois law,[2] the elements for common law fraud are:

(1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury.

*Siegel v. Levy Org. Dev. Co., Inc.,* 153 Ill.2d 534, 180 Ill.Dec. 300, 607 N.E.2d 194, 198 (1992) (citing *Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982)). As previously stated, all allegations of fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). Fed.R.Civ.P. 9(b); *see supra* Part II.B.1.a (explaining the requirements of Rule 9(b)).

▮ In this case, Quitman has sufficiently alleged a fraud claim. Quitman has alleged that (1) Lefkofsky and Keywell both made a false statement of material fact in that they misrepresented the amount of business which Brandon would be doing with Wards; (2) Lefkofsky and Keywell knew that the statements that they made were fraudulent; (3) Quitman had the right to rely on those statements; (4) Quitman did rely on the statements by entering into the factoring agreement; (5)

---

**2.** The parties apparently agree that Illinois law governs all of the state-law claims in this case. Therefore, for the purposes of this mo-

tion, the court will apply Illinois state law to all of the state-law claims.

the statements were made for the purpose of inducing Quitman to enter into the factoring agreement; and (6) Quitman's reliance led to Quitman's injury. Accordingly, the court denies counter-defendants' motion to dismiss Count IV of the counterclaim.

### III. *CONCLUSION*

For the foregoing reasons, the court grants in part and denies in part counter-defendants Brandon Apparel Group, Inc., Bradley Keywell and Eric Lefkofsky's motion to dismiss Counts I–IV of counter-claimant Quitman Manufacturing Co.'s counterclaim. The motion is granted as to Counts I–III of the counterclaim and denied as to Count IV of the counterclaim. The court will grant Quitman Manufacturing Co. until July 11, 1999 to file an amended counterclaim to amend Counts I–III.