GREENBERG, Circuit Judge,
dissenting.
In its amended complaint, the Estate of Charles L. Tabas seeks to transform its state-law dispute with the defendants over the proper allocation of a partnership’s profits into a federal RICO case simply by alleging that the defendants used the United States mail to communicate with it over a substantial period of time. While we have not considered directly whether a plaintiff can bring a RICO action in such circumstances, our precedents clearly forbid such alchemy. See Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 609-11 (3d Cir.1991), cert. denied, 501 U.S. 1222, 112 S.Ct. 2300, 119 L.Ed.2d 224 (1992); Hindes v. Castle, 937 F.2d 868 (3d Cir.1991); Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406 (3d Cir.), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991); Banks v. Wolk, 918 F.2d 418 (3d Cir.1990); Marshall-Silver Constr. Co. v. Mendel, 894 F.2d 593 (3d Cir.1990); Swistock v. Jones, 884 F.2d 755 (3d Cir.1989). Therefore, I would affirm the grant of summary judgment in favor of the defendants, and I respectfully dissent.[1]
I agree with the majority that the central issue in this appeal is whether the Estate has alleged that the defendants engaged in a “pattern of racketeering activity” as defined in 18 U.S.C. § 1961(5).[2] Majority typescript at 1289-90. As noted by the majority, to establish a pattern of racketeering activity, a plaintiff “must show that the racketeering predicates are related, and that they amount *1303 to or pose a threat of continued criminal activity.” H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (emphasis in original). Thus, a plaintiff seeking to- bring a RICO claim must allege, among other things, relatedness and continuity.
As the majority states, the predicate acts are 41 instances of alleged mail fraud. Of these, 39 were the mailing of $15,000 checks to the Estate, totalling $585,000, representing monthly distributions from Tabas Enterprises. The remaining two were the mailing of yearly tax forms to the Estate. Amended Complaint ¶ 49, App. at 43-46. According to the amended complaint, the checks were sent from December 22, 1987, to February 19, 1991, a period of over three years.[3] The Estate also alleges as predicate acts that the defendants used the United States mail to send checks to members of Daniel Tabas’s family for work not performed. Amended Complaint ¶ 51, App. at 46-47.[4] The majority, however, does not rely on these allegations as the Estate did not provide evidence that these checks were mailed, and the evidence on the motion for summary judgment established that a courier delivered them. I agree with this disposition and thus conclude that we are concerned only with the mailing of the $15,000 cheeks and the tax forms.
I would hold that these mailings are related.[5] See Kehr Packages, 926 F.2d at 1414 (noting that relatedness test almost always will be satisfied “in cases alleging at least two acts of mail fraud stemming from the same fraudulent transaction”). However, in my view these mailings do not satisfy the continuity requirement as defined by the Supreme Court’s and our precedents. In H.J. Inc., the Supreme Court stated that eontinuity “is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.” 492 U.S. at 241, 109 S.Ct. at 2902 (citing Barticheck v. Fidelity Union Bank/First Nat’l State, 832 F.2d 36, 39 (3d Cir.1987)). If a plaintiff does not allege that the predicate acts lasted over a “substantial period of time,” then it must allege a threat of continued criminal activity. Id. 492 U.S. at 242, 109 S.Ct. at 2902; Marshall-Silver, 894 F.2d at 596. Conversely, if a plaintiff alleges that the predicate acts lasted a substantial period of time, then it need not allege a threat of future criminal conduct. Therefore, a plaintiff alleging ,a closed-ended scheme has both a lesser burden in that it does not have to demonstrate a threat of future harm, and a greater burden in that it must establish that the predicate acts continued over a substantial period of time.
Although we do not have a bright-line rule establishing how long the predicate acts must last to constitute a “substantial period of time,” I will assume that the period of over three years in this case would satisfy any such definition.[6] Yet, simply by clearing this duration hurdle the Estate does not establish continuity for we have stated clearly and repeatedly that duration is a necessary but not sufficient condition to proving continuity. In Hindes v. Castle, for example, we stated:
The post-H.J. Inc. cases decided by this court which have focused on pattern all make clear that duration is the sine qua non of continuity. While it is not in itself sufficient to establish a pattern, a determination that must be made in light of all of *1304 the Barticheck factors, no pattern can be shown without the required duration.
937 F.2d at 873 (emphasis added). Likewise, in Marshall-Silver we recognized:
[I]f the Court in H.J. Inc. intended that the duration of the predicate acts or the threat arising therefrom should be determinative ... we would not have expected the Court to eschew providing a specific standard in favor of a fact oriented, case-by-ease development.
894 F.2d at 597 (emphasis in original) (dicta); see also Kehr Packages, 926 F.2d at 1412 (noting that “the length of time over which the criminal activity occurs or threatens to occur is an important factor,” but not stating that it is dispositive). Accordingly, a more detailed analysis of the complaint is required.[7]
In Barticheck v. Fidelity Union Bank/ First Nat’l State, 832 F.2d 36, we set forth six factors that a court should address in considering whether the plaintiff has alleged a pattern of racketeering: (1) the number of unlawful acts; (2) the length of time over which the acts were committed (duration); (3) the similarity of the acts; (4) the number of the victims; (5) the number of perpetrators; and (6) the character of the unlawful activity. Id. at 39. The majority nevertheless concludes that having “found a pattern of racketeering activity in both the duration of and the on-going threat implicit in defendants’ regular way of doing business [it] will not go on to analyze this case under the six Barticheck factors.” Majority at 1296. The majority then indicates that its decision not to employ the Barticheck factors does not mean that they are irrelevant in determining where there is continuity, as a court may consider the factors if relatedness and continuity are in doubt.
I reject the majority’s approach. To start with, continuity is in doubt here. But quite aside from that consideration it seems to me that the majority’s approach inevitably leads to analytical looseness in determining whether there has been a pattern of racketeering activity. While I do not doubt that in practice the Barticheck factors cannot be applied with mathematical precision, at least the factors are guidelines in determining whether the plaintiff has demonstrated continuity and relatedness.
The majority opinion would be more justifiable if it were to say that after H.J., Inc., the earlier explicated Barticheck factors are no longer relevant, in any continuity analysis. While I would disagree with that holding, such a result would have some analytical consistency. But by saying the Bartichek factors are relevant in some cases but not in others, see majority at 1296-97 & n. 21, the majority winds up saying that the Barticheck factors — which are designed to answer the broader question of whether particular facts *1305 fairly can be characterized as a RICO case— may shed light on whether a three-month long scheme constitutes a pattern of racketeering activity but not on whether a three-year long scheme constitutes such a pattern. It seems to me self-evident that there are three-month long schemes that clearly fall within RICO’s purview and three-year schemes that clearly do not. Thus, if the Barticheck factors are relevant at all, they are relevant in shedding light on all cases. The majority’s approach to the complex statute does injustice to the Supreme Court’s admonitions to courts to take a “flexible approach” when interpreting the “continuity” prong of the statute and to develop the concepts behind “pattern of racketeering activity” on a ease by case basis. See H.J. Inc., 492 U.S. at 238, 243, 109 S.Ct. at 2900, 2902-03. See also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 500, 105 S.Ct. 3275, 3287, 87 L.Ed.2d 346 (1985) (Congress “and the courts” should “develop a meaningful concept of ‘pattern.’ ”) (emphasis added).
Of course, as I have indicated, we decided Barticheck before the Supreme Court’s decision in H.J. Inc. Nevertheless, we have noted in post-H.J. Inc. cases that the Barti-check factors are still relevant and must be considered “ ‘as they bear upon the separate questions of continuity and relatedness.’ ” Hindes, 937 F.2d at 873 (quoting Banks, 918 F.2d at 423); accord Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1023-25 (7th Cir.1992) (noting that factors set forth in Morgan v. Bank of Waukegan, 804 F.2d 970, 975 (7th Cir.1986), which are similar to Barti-check factors, apply even after H.J. Inc.). In Marshall-Silver, we recognized that all of the Barticheck factors except the third, the similarity of criminal acts, are relevant to the question of continuity. 894 F.2d at 595 n. 1; see also Hindes, 937 F.2d at 873 (reaffirming this view). Thus, the question of continuity is an “ ‘inquiry into the extent of the [defendant’s] racketeering activity,’ ” Marshall-Silver, 894 F.2d at 595 (quoting Barticheck, 832 F.2d at 40), and requires an examination of the five Barticheck factors relevant to continuity. Moreover, in applying these factors, we must take a “natural and common sense approach” to continuity. H.J. Inc., 492 U.S. at 237, 109 S.Ct. at 2899. In view of these precedents in which so many of the judges of this court have joined, I am perplexed at the majority’s subordination of Barticheck.
Inasmuch as I would apply Barticheck in this case I will now make an analysis of the factors it set forth. The first factor, the number of unlawful acts, might appear to weigh in favor of continuity as the Estate alleged that the defendants engaged in over 40 predicate acts. However, as we stated in Kehr Packages, “the continuity question should not be affected by the fact that a particular fraudulent scheme involved numerous otherwise ‘innocent’ mailings, rather than only a few.” 926 F.2d at 1414. Rather, what needs to be considered is the underlying scheme: “Although the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis.” Id.; see also Midwest Grinding Co., 976 F.2d at 1024 (“Although the sheer number of predicate acts might appear at first glance to prove continuity, when it comes to a pattern premised on acts of mail or wire fraud, the volume of mailings is not dispositive.”).
In this case, the alleged underlying scheme was an attempt to defraud the Estate out of its rightful share of the partnership income. Thus, the allegations of fraud relate to a discrete dispute, rather than to numerous distinct attempts to defraud. To paraphrase Kehr Packages, “[i]t should not be relevant ... that [the defendants] sent [checks] on a monthly basis, rather than quarterly or yearly.” 926 F.2d at 1414. Thus, “the sizable number of mailings does not show that the defendants operated a long-term criminal operation.” Midwest Grinding Co., 976 F.2d at 1025. Accordingly, this factor weighs against a finding of continuity.
The second factor is duration. As I noted above, the alleged fraudulent activity lasted for at least three years. However, the significance of the length of the alleged scheme is diminished by the nature of the scheme itself. In this regard, I reiterate that the defendants repeated the same allegedly fraudulent act over three years. Thus, this is not a case in which each mailing constitut *1306 ed a new fraudulent act. See Kehr Packages, 926 F.2d at 1415 (distinguishing Fleet Credit Corp. v. Sion, 893 F.2d 441 (1st Cir.1990), because in Fleet Credit “each mailing constituted a new fraudulent act”). As we noted in Marshallr-Silver:
Where such a fraudulent scheme inflicts or threatens only a single injury, we continue to doubt that Congress intended to make the availability of treble damages and augmented criminal sanctions dependent solely on whether the fraudulent scheme is well enough conceived to enjoy prompt success or requires pursuit for an extended period of time.
894 F.2d at 597. Therefore, while the second factor, duration, does weigh in favor of continuity, it is not a heavy weight on the scale. I will not discuss the third factor, the similarity of the alleged criminal acts, as that factor concerns relatedness, which I have found in this case.
The fourth factor, number of victims, weighs against a finding of continuity for, as the district court correctly indicated, this is a single-victim case. The Estate disputes this conclusion, contending that all six of the beneficiaries of the Estate are victims, including a charitable foundation that ultimately benefits hundreds, if not thousands, of people. Brief at 27 n. 18. Yet, this argument is supported neither by the ease law nor the amended complaint itself. In Kehr Packages, we addressed an analogous situation and found that the only victim of the defendants’ alleged criminal activity was the company and not its shareholders or its guarantors. We reached this conclusion because “Kehr’s individual shareholders and guarantors, and the holders of pledged collateral, were affected only indirectly.” 926 F.2d at 1418-19; see also Hughes, 945 F.2d at 611 (noting that alleged scheme affected single victim, “albeit a class of victims,” in rejecting RICO claim). Similarly, here the scheme affected the beneficiaries of the Estate only indirectly.
Additionally, throughout its amended complaint, the Estate maintains that the fraudulent conduct deprived it, the Estate, of its rightful share of the income. Indeed, according to the 1964 Partnership Agreement, the deceased party’s share of the income is payable to his estate, not to his heirs. App. at 155. Wfliile it is true that the presence of only one victim, like the existence of only one scheme, does not necessarily preclude the finding of a RICO pattern, this fact clearly weighs against the finding of continuity. See United States Textiles, Inc. v. Anheuser-Busch Cos., 911 F.2d 1261, 1268 (7th Cir.1990). Indeed, when there is only one victim and that victim is engaged in a business relationship with the defendant, the dispute between the parties may be nothing more than a civil controversy.
The fifth factor, the number of perpetrators, does appear to weigh in the Estate’s favor. The district court stated that there was only one perpetrator, “Daniel Tabas or individuals under his control.” Opin. at 1285-86. But this conclusion is inherently contradictory for even if the other perpetrators are under Daniel’s control, they still existed. In fact, the district court’s description could be used to describe an organized crime family, yet clearly Congress meant RICO to cover organized crime. Nonetheless, this error is not significant, for even if the number were as large as the Estate argues, the fact that more than one person was involved in a scheme to defraud that lasted a substantial period of time cannot without more establish continuity. Indeed, in some ways this is the least important factor. Cf. Wade v. Hopper, 993 F.2d 1246, 1251 (7th Cir.) (per curiam) (listing factors relevant for continuity determination similar to those listed in Barticheck but not including number of perpetrators), cert. denied, — U.S. -, 114 S.Ct. 193, 126 L.Ed.2d 151 (1993); Morgan v. Bank of Waukegan, 804 F.2d at 975 (listing same factors in pre-H.J. Inc. case). Thus, this factor does not place a heavy weight on the continuity side of the scale.
The final factor, the character of the unlawful activity, is perhaps most important in assuring that RICO is applied in a manner consistent with congressional intent. Congress aimed to prevent long-term criminal activity, but not to federalize every garden-variety claim of fraud. “The concept of ‘continuity’ plays an important constraining role *1307 in the operation of the RICO statute” by requiring a court to examine not only the “period of time over which the predicate acts occurred or ... during which any threatened criminal activity would be likely to last,” but also the character of the predicate acts and the extent of the injury generated by the acts. Marshall-Silver, 894 F.2d at 596-97. In this case the character of the alleged acts of mail fraud and the confined extent of the injury weigh heavily against the Estate. “Repeated mailings in furtherance of a single scheme to inflict one fraudulent injury may be no indication of the underlying fraud’s continuity.” Shields Enters., Inc. v. First Chicago Corp., 975 F.2d 1290, 1295 (7th Cir.1992).
As I already have noted, this ease evolves from an ongoing dispute regarding the appropriate split of a partnership’s profits. The allegations of fraud do not pertain to how Tabas Enterprises conducts its business, but only to its internal functioning. Moreover, unlike other conduct which can constitute racketeering activity, such as extortion, robbery, or murder, there is nothing inher-' ently criminal in mailing a letter containing a check or a tax form. See 18 U.S.C. § 1961(1). Indeed, the vast majority of mailings undoubtedly are lawful. Thus, in this case the mailings could be regarded as racketeering activity only by reference to matters beyond the letters and their contents.
The unreasonableness of regarding the mailing of the thirty-nine $15,000 checks as RICO predicate acts in this case is demonstrated by considering what would have happened if the defendants had delivered the cheeks rather than mailed them. In that case, they could not have committed mail fraud and the Estate could not have pleaded a RICO case, as there would have been no predicate acts on which to base the complaint. Rather than seeking threefold damages under RICO, 18 U.S.C. § 1964(c), the Estate would have been limited to a state law claim — even though at bottom the unlawful activity in both that hypothetical case and this case involves conduct of precisely the same character. I thus ask the following question: is it conceivable that Congress intended that RICO could be applied to a defendant who mails substantial payments to the plaintiff, but not to the same defendant if it delivers the payments?[8] The question answers itself. Thus, the fact that this case involves mail fraud rather than some other type of fraud is entirely fortuitous, and that fortuity should not result in a windfall to the plaintiffs. But by ignoring the Barticheck factors, and therefore failing to inquire into the character of the unlawful activity, the majority endorses just that counterintuitive result.
I recognize that the complaint is rife with contentions that the defendants’ activity defrauded the Estate out of its fair share of the partnership’s income. Yet the Estate does not allege that the defendants’ conduct has ramifications outside the confines of the immediate dispute regarding the division of the partnership’s profits. Thus, the broader threat is minimal at most. See Meade v. Meade, 1991 WL 243539, *5 (E.D.Pa. Nov. 18, 1991) (“This is a dispute between a small number of parties, and neither directly affects nor has wider implications for a large number of people. Actual and threatened societal injury is little, if any. Finally, each alleged act of mail and wire fraud forms part of one, extended scheme, reinforcing the essentially isolated nature of the alleged racketeering activity.”), reconsideration denied, 1992 WL 6929 (E.D.Pa.1992), aff'd, 998 F.2d 1004 (3d Cir.1993) (table); Rumbaugh v. Chandler, 1991 WL 169046, *4 (E.D.Pa. Aug. 27, 1991) (App. at 1893-900) (“This action does not concern an extensive criminal enterprise whose long-standing, repeated conduct has caused and will continue to cause a severe injury to the community. Rather, it is a private dispute between two ex-partners that has continued over twelve years in various forms.”).
*1308 I make one final but critical point with respect to the character of the unlawful activity in this case. I focus on this point because I regard the character of the activity as the most significant Barticheck factor in this ease. As the majority points out, 39 of the predicate acts consist of the mailing of $15,-000 checks to the Estate and the other two concern mailing tax forms. Reliance on such predicate acts is problematic because the Estate is pleading in essence that the defendants committed “mail fraud” by sending it money. I can conceive of cases in which a defendant’s act of sending money may constitute fraud; perhaps, even, the defendants’ activities (as alleged in this case) theoretically could be prosecuted under the mail fraud statute,[9] although it must be remembered that “not every use of the mails ... in connection with a scheme is punishable” as mail fraud. United States v. Frey, 42 F.3d 795, 797-98 (3d Cir.1994). But three undisputed facts belie the conclusion that this is therefore a RICO case. First, between March 1983 and September 1986, “Tabas Enterprises paid for various personal expenses incurred by Hamette [as well as] Daniel.” Majority typescript at 1282. Second, “[p]rior to Charles’s death ... the brothers appeared to have an arrangement under which Tabas Enterprises paid for many personal and business expenses.” Majority typescript at 1282 n. 2 (emphasis added). Finally, as the majority indicates, plaintiffs acknowledge that as of the time of the state court lawsuit, “they believed Daniel was taking more than he was entitled to under the partnership agreement ... They contend [only] that they did not know the extent to which they were being short-changed_” Majority typescript at 1282 n. 3 (emphasis added).
These facts make difficult to accept the majority’s conclusion that the “mailings [were] ‘designed to lull [the Estate] into a false sense of security, postpone [its] ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.’ ” Majority at 1294-95 n.- 18 (citation omitted). In any event, no matter how the Estate characterizes this case, and even if there were some fraudulent acts, this suit is first and last a dispute about how the partnership income should have been distributed. Seen in this context, the mailing of the cheeks was so benign an act that it is a thin foundation on which to build the continuity element. At bottom, regardless of the pejorative words which the Estate uses to characterize the defendants’ conduct, this case involves a commercial dispute over a discrete issue, the amount due to the Estate in its monthly draws. Such a dispute is simply not a RICO controversy.[10]
I recognize that the majority has listed numerous questionable expenses charged against Tabas Enterprises and I further acknowledge that the defendants may have state law liability for some of these expenses. But it is important in considering this case to keep in mind that the incurring of these expenses is not the predicate criminal conduct charged in this case. Rather, the predicate acts to establish RICO jurisdiction are the use of the mails to disburse checks and to distribute forms. Overall, therefore, after consideration of the character of the unlawful activity, together with the other relevant Barticheck factors, both qualitatively and quantitatively, I conclude that the Estate has failed to establish a genuine issue of material fact over continuity and that this case is yet another attempt by a plaintiff “to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions.” Midwest Grinding Co., 976 F.2d at 1025.
In reaching my conclusions, I have taken particular note of our opinion in Jordan v. Fox, Rothschild, O’Brien & Frankel, 20 F.3d *1309 1250 (3d Cir.1994), which affirmed the district court’s judgment granting certain of the defendants “summary judgment on the RICO claim against them for failure to show relatedness and continuity ... essentially for the reasons given by the district court.” Id. at 1254. The district court opinion is reported as Jordan v. Berman, 792 F.Supp. 380 (E.D.Pa.1992). Jordan is a complex case involving a controversy between tenants and a landlord, the details of which I need not discuss. Germane here is the district court’s conclusion that the plaintiffs had not adduced “evidence from which one could reasonably find a pattern of racketeering activity under prevailing ease law.” Id. at 388. The district court explained the basis for its decision as follows:
Few relationships in our society seem to engender more conflict than that of landlord and tenant. The aggressive landlord and the disgruntled tenant have almost become stereotypical. The instant case involves a typical landlord-tenant dispute about the construction of a lease and what sums or services the respective parties are entitled to. Permitting trash to accumulate for a day, disrupting utility service for half a day and vigorously pursuing a plausible contract interpretation are generally not the kind of things from which RICO cases are made. The actions of defendants and their agents, however characterized, do not pose the type of significant societal threat that RICO was designed to deter or penalize.
Id. (emphasis added). By affirming “essentially for the reasons given by the district court,” we approved the foregoing statement, even though the case involved the use of the mails and thus, in theory, could have been a RICO case.
If we substituted the relationship between partners for the landlord-tenant relationship, the underscored language in the above quotation would describe this case. Certainly the partnership relationship, like the landlord-tenant relationship, is a frequent source of disputes. The dispute in this case, to quote from and to paraphrase Jordan v. Berman:
involves a typical [partnership] dispute about the construction of a [partnership agreement] and what sums ... the respective parties are entitled to_ The actions of defendants and their agents, however characterized, do not pose the type of significant societal threat that RICO was designed to deter or penalize.
Thus, this case is no more a RICO case than was Jordan.
In coming to my conclusions I also have found it useful to consider United States v. Pelullo, 964 F.2d 193 (3d Cir.1992), a case which the majority cites and on which the Estate relies. Pelullo is a post-N./. Inc. case in which we found that a RICO violation could be proved based on a closed-ended scheme that lasted 19 months. In Pelullo, the defendant was a chief executive officer of The Royale Group, Ltd., a publicly held corporation which through subsidiaries acquired six hotels in Miami Beach. In June 1984, the hotels obtained a $13.5 million loan from a subsidiary of American Savings and Loan Association. Under the terms of the loan, $6.2 million was to be used for renovation, with American retaining this portion and disbursing the funds as renovation costs were incurred. To obtain a disbursement, Royale was required to submit draw requests which set forth a certified itemization of the costs.
The indictment charged Pelullo with three fraudulent schemes: (1) defrauding American, Royale, and Royale’s shareholders by submitting false documents in connection with certain draw requests; (2) defrauding Royale of $114,000 by diverting cash from one of its subsidiaries to repay a debt Pelullo owed; and (3) defrauding Royale of approximately $500,000 by diverting money for uses other than for the purposes of the loans. Accordingly, the alleged number of schemes in Pelullo was larger than the one scheme alleged here. And while the number of victims in Pelullo could be characterized as small, the nature of the unlawful activity had a different ring to it, because in Pelullo the alleged perpetrator was an officer in a public company and the main victims (American and Royale) were public entities. Moreover, the alleged fraud was not confined to Royale’s internal operations, but took place in the *1310 context of its normal external business operations. Thus, even though the Estate relies on Pelullo, that case involved much more than a dispute between partners and does not support the Estate’s position. Pelullo nevertheless is instructive to illustrate the contrast between a real RICO case and the Tabas’s dispute.
While I do not suggest that a plaintiff alleging a single fraudulent scheme injuring a single victim in the context of a private dispute never can maintain a RICO claim, it would be unusual for such a case to be covered by RICO, especially where the alleged predicate acts are mail fraud. In reaching’this conclusion, I am cognizant that “RICO’s pattern requirement does not require the existence of more than one ‘scheme,’ ” Marshall-Silver, 894 F.2d at 596, and that the Supreme Court has declared that the RICO statute should be read broadly “to reach both ‘legitimate’ and ‘illegitimate’ enterprises,” Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985). Furthermore, I recognize that the Court has noted that civil RICO appears to be “evolving into something quite different from the original conception of its enactors,” and that this problem is for Congress, not the courts, to correct. Id. at 499-500, 105 S.Ct. at 3287. See also NOW v. Scheidler, — U.S.-,-, 114 S.Ct. 798, 806, 127 L.Ed.2d 99 (1994).
Yet our precedents clearly establish that Congress did not intend RICO to cover every garden-variety fraud. See Marshall-Silver, 894 F.2d at 597; accord Midwest Grinding Co., 976 F.2d at 1025 (“[I]t is equally evident that RICO has not federalized every state common-law cause of action available to remedy business deals gone sour.”). Rather, the Supreme Court, “by refocusing the pattern requirement on the sort of long-term criminal activity that carries some quantum of threat to society,” Midwest Grinding Co., 976 F.2d at 1025, has attempted “to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law,” id. at 1022; see also Mar-shall-Silver, 894 F.2d at 596-97 (noting that continuity plays an important role in constraining operation of RICO statute to only those activities which threaten societal injury). Moreover, the Supreme Court has confined the scope of RICO by limiting the persons who can be liable under 18 U.S.C. § 1962(c). See Reves v. Ernst & Young, — U.S. -, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).
In my view, the majority!s opinion inexorably will result in federalizing numerous internal business disputes in a way that Congress never could have intended. The opinion as applied in this circuit will lead attorneys to repackage as RICO actions ordinary commercial controversies in which the parties have communicated by mail or wire. Indeed, it seems obvious that the principles of this case could be applied to routine commercial disputes in many situations in which the parties have been in an ongoing relationship, e.g., partnerships, tenancies, employer-employee, service contracts, supply contracts, equipment rentals, brokerage accounts, and others as well. A party in such a relationship, dissatisfied with the other party’s performance, will be able to establish RICO jurisdiction by alleging fraud and pointing to the other party’s numerous mailings in furtherance of its understanding of the terms of the relationship. For the foregoing reasons, I dissent.
Chief Judge SLOVITER,[11] and Judges HUTCHINSON, SCIRICA, COWEN, and NYGAARD[12] join in this dissent.

. The Estate may have valid claims under state law, but I would hold that the district court did not abuse its discretion in dismissing these claims pursuant to 28 U.S.C. § 1367.

. I also agree with the majority that the 1987 settlement and the subsequent mutual release do not preclude the Estate from bringing this case. X mention this point because, as the majority notes, this issue was considered by the panel only and I was a member of the panel.

. The amended complaint recites that the last two checks were sent on January 18, 1990, and February 19, 1990. Amended Complaint at 34. However, these dates appear to be typographical errors because they are listed in an otherwise chronological sequence in which the next preceding date was December 14, 1990.

. In their brief, the defendants maintain that this allegation does not satisfy the pleading requirements of Fed.R.Civ.P. 9(b). Brief at 30 n. 6; see Banks v. Wolk, 918 F.2d at 422 n. 1 (noting that allegations of mail fraud must be plead with specificity required by Fed.R.Civ.P. 9(b)). I do not address this contention because even assuming that the pleading requirement is met, the allegations were refutéd and, in any event, the Estate's allegations as a whole do not state a claim under RICO.

. While the majority does not hold explicitly that they are related, it implicitly reaches this conclusion.

. While I treat this case as a closed-ended case, obviously if I considered it as open-ended my result would be the same.

. Our rule that duration is a necessary but not sufficient condition to establish continuity is consistent with the Supreme Court's statement in H.J. Inc.: "petitioners claim that the racketeering predicates occurred with some frequency over at least a 6-year period, which may be sufficient to satisfy the continuity requirement.” 492 U.S. at 250, 109 S.Ct. at 2906 (emphasis added). By using the word "may,” the Court implicitly rejected the notion that duration alone establishes continuity.
Precedents in other circuits could be read to suggest that duration alone can satisfy continuity. See, e.g., Dana Corp. v. Blue Cross & Blue Shield Mutual, 900 F.2d 882, 886-87 (6th Cir.1990) (stating that in a single-scheme, single-victim case "the allegations of fraud occurring for a period of seventeen years, along with the specific mailings evidencing such a scheme, are sufficient to state a claim of a pattern of racketeering activity”); Fleet Credit Corp. v. Sion, 893 F.2d 441, 446-47 (1st Cir.1990) (finding that 95 fraudulent mailings sent over a four and one-half year period are sufficient to establish continuity); Walk v. Baltimore & Ohio & R., 890 F.2d 688, 690 (4th Cir.1989) (reversing dismissal where complaint alleged 10-year scheme to defraud plaintiffs); Jacobson v. Cooper, 882 F.2d 717, 720 (2d Cir.1989) (stating that continuity existed because predicate acts alleged occurred over "a matter of years”). However, it is not clear that in any of these cases, the courts of appeals faced a factual situation analogous to the one presented here, i.e., a dispute over the profits of a partnership. This case most similar to this one is Jacobson. In Jacobson, the plaintiff alleged that the two defendants, one of which was his son, attempted to defraud him out of real estate holdings that he owned. While the nature of the dispute is somewhat similar, the alleged predicate acts went beyond mail fraud and included extortion, larceny, offering false instruments for filing, and usury. 882 F.2d at 719. Thus, the character of the unlawful activity in Jacobson is vastly different than that alleged here. In any event, we are not bound by Jacobson.

. While the majority answers that Congress did intend to distinguish between mailings and hand deliveries as the former but not the latter could be mail fraud, this answer misses my point. My point is that in considering the character of the unlawful acts in accordance with the sixth Barti-check factor, the use of the mails was purely fortuitous in this particular case and it was the alleged fraud and not how the checks were delivered which injured the Estate.

. See Schmuck v. United States, 489 U.S. 705, 714-15, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989) ("To the extent that Schmuck would draw from these previous cases a general rule that routine mailings that are innocent in themselves cannot supply the mailing element of the mail fraud offense, he misapprehends this Court's precedents.”).

. Keeping in mind that this case is really about who gets to use the partnership income for what purpose, consider what would have happened if the defendants had paid nothing to the Estate over the three-year period in which they actually paid $585,000. The Estate would have gotten nothing and there would not be a RICO case.

. Judge Sloviter joins with the following statement. Although I do not agree with every detail of Judge Greenberg’s dissent, I join it because it comes closest to expressing my frustration that the analytic litany that the courts must now conduct in civil RICO cases leads to a result, the federalization of garden variety fraud, that is directly contrary to Congress’s expressed intent.

. Judge Nygaard joins in the dissent, believing that the district court properly granted summary judgment in favor of the defendants. He bases his conclusion that summary judgment was prop *1311 er, however, upon plaintiffs’ failure to show facts giving rise to mail fraud under RICO rather than upon a failure to establish a pattern of racketeering activity. Under Judge Nygaard’s analysis, the mailings here were, as in United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), merely post-fraud means of transmitting matter from one place to another. Judge Nygaard believes that inasmuch as the fraud "had reached fruition,” at the time of the mailing, it cannot be said that the mailings in question were for the purpose of executing the scheme, as required by the statute. Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944). Hence, it was not "an essential step” in the success of the fraud. Schmuck v. United States, 489 U.S. 705, 714, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989).