**Ihor KLEBAN, Plaintiff,**

v.

**S.Y.S. RESTAURANT MANAGEMENT, INC., an Illinois Corporation, International Double Drive–Thru, Inc., an Illinois Corporation, Andrew Sun, John Young, Thomas J. Singer, John D. Terzakis, individually and d/b/a Midwest Properties, James W. Thompson, Jr., individually and d/b/a James Thompson Agency, Joseph Tedesco, individually and d/b/a Tedesco and Associates, John A. Garrity III, Esq., Michael Mullally, St. Louis Double Drive–Thru, Inc., an Illinois Corpora-**

---

tion, Willowbrook Restaurant Corporation, an Illinois Corporation, Illinois Petroleum Co., an Illinois corporation, Restaurant Development Corporation, an Illinois corporation, Greenscape Landscaping, Inc., an Illinois corporation, Defendants.

No. 95 C 2920.

United States District Court,
N.D. Illinois,
Eastern Division.

Nunc Pro Tunc April 26, 1996.

June 7, 1996.

John D. Galarnyk, Galarnyk & Associates, Ltd., Chicago, IL, David Scott Grosky, Law Offices of David S. Grosky, Northbrook, IL, for Ihor Kleban.

Robert A. Habib, Chicago, IL, for S.Y.S. Restaurant Management Inc., International

Double Drive–Thru, Inc., Andrew Sun, John Young.

Thomas J. Singer, Charleston, IL, Pro Se.

James K. Meguerian, Victoria Perette Pappas, D'Ancona & Pflaum, Chicago, IL, for John D. Terzakis, St. Louis Double Drive–Thru, Inc., Willowbrook Restaurant Corporation, Illinois Petroleum Co., Restaurant Development Corporation.

Jeffrey Edward Kehl, Dowd & Dowd, Ltd., Chicago, IL, for John A. Garrity, III, Michael Mullally, Greenscape Landscaping, Inc.

John K. Kneafsey, Donald Cahill Shine, Nisen & Elliott, Chicago, IL, for Burling Bk.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

On May 16, 1992, Ihor Kleban filed suit against numerous defendants. Several defendants subsequently filed various motions to dismiss the complaint. Those motions were granted in part. Mr. Kleban then filed an amended complaint attempting to cure the defects in his previous complaint and adding several new defendants. S.Y.S. Restaurant Management, Inc. ("S.Y.S."), International Double Drive–Thru, Inc. ("IDDT"), Andrew Sun, John Young, Thomas Singer, John Terzakis, Midwest Properties, John Garrity, Willowbrook Restaurant Corp. ("Willowbrook"), Illinois Petroleum Co. ("IPC"), Restaurant Development Corp. ("RDC"), and Greenscape Landscaping, Inc. ("Greenscape"), have again filed various motions to dismiss the complaint. Burling Bank, a newly added defendant, also moves to dismiss the suit. For the reasons stated below, the motions of S.Y.S., IDDT, Mr. Sun, Mr. Young, Midwest Properties, Willowbrook, IPC, RDC, Greenscape, and Burling Bank are granted. The motions of Messrs. Terzakis, Singer, and Garrity are granted in part and denied in part.

### Background

Mr. Kleban invested in a limited partnership, Southwest Double Drive–Thru, L.P. ("Southwest Partnership"), which was formed to own and operate Checkers restaurants. Mr. Kleban's investment has lost its value, and he blames this loss on the fraud of the defendants. He therefore brought this suit, alleging common law fraud, negligent misrepresentation, conversion, and violations of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j (1981), the Illinois Securities Law of 1953, 815 ILCS 5/1 et seq. ("the Illinois Securities Law") (1993), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. (1984).

Mr. Terzakis has filed a motion to dismiss the amended complaint on behalf of himself, Midwest Properties, Willowbrook, IPC, and RDC. Mr. Singer has filed a motion to dismiss, joining Mr. Terzakis's arguments. Mr. Garrity has filed a motion to dismiss on behalf of himself and Greenscape. S.Y.S., IDDT, and Messrs. Young and Sun (collectively, "the IDDT defendants") have filed a motion to dismiss. Finally, Burling Bank has moved to dismiss the complaint against it.

Mr. Kleban's complaint alleges the following facts, taken as true for purposes of these motions to dismiss. Bane v. Ferguson, 890 F.2d 11 (7th Cir.1989).

Checkers Drive–In Restaurants of North America, Inc. ("Checkers") is a national franchisor of fast-food restaurants. In November of 1988, it granted the sole and exclusive right to develop, own, and operate Checkers Restaurants in the Chicago Area to defendant S.Y.S. S.Y.S. is a corporation owned by defendants Thomas Singer, Andrew Sun, and John Young.

In May of 1990, the three S.Y.S. shareholders entered into a "Joint Development Agreement," through which they agreed to divide the Chicago market into two territories. Messrs. Sun and Young formed defendant IDDT, which obtained the right to develop the southern territory, while Mr. Singer formed Chicago Double Drive–Thru, Inc. ("CDDT"), which obtained the right to develop the northern territory. Although CDDT and IDDT competed for patronage, they did retain some control over each other. For example, they agreed to some joint marketing efforts. They jointly owned the intellectual property of each restaurant. They had certain rights to approve or veto

the sites on which restaurants would be developed. Moreover, because the Checkers franchise had been granted to S.Y.S., neither CDDT nor IDDT could communicate directly with Checkers without written consent from S.Y.S.

Mr. Singer also formed the Southwest Partnership to develop and operate four Checkers restaurants in Chicago. Southwest Partnership had several limited partners, including Mr. Kleban, and a general partner. The general partner of the Southwest Partnership was a limited partnership called Associates which had CDDT as its sole limited partner. In July of 1992, CDDT also became the general partner of Associates. Because CDDT became both the sole limited partner and sole general partner of Associates, Associates was dissolved.

Defendant Terzakis was an officer and shareholder of CDDT. Mr. Terzakis also "owned, controlled, and/or managed" entities which provided goods and services to Checkers Restaurants. These entities include the defendants Willowbrook, IPC, RDC, and Midwest Properties. Defendant Garrity was counsel for CDDT and "represented and/or managed" aspects of the Checkers operation. Additionally, both Messrs. Garrity and Terzakis acted as "promoter[s] and marketing agent[s]" of the Checkers operation. Defendant Greenscape, a corporation owned in part by defendants Singer and Garrity, provided landscaping and maintenance services to CDDT. Finally, Burling Bank was a lender and depository for CDDT and the personal banker for defendants Terzakis, Singer, Tedesco, Thompson, and Garrity. Burling Bank required the individuals to use Burling Bank's services for their personal banking in exchange for lending money to the CDDT Checkers restaurants.

On November 25, 1991, Mr. Kleban made a $100,000 limited partnership investment in Southwest Partnership. On February 1, 1992, defendant James Thompson solicited Mr. Kleban to make an additional investment in Southwest Partnership. Mr. Kleban then made a $150,000 additional limited partnership investment. In May of 1992, defendant Thompson solicited yet another investment from Mr. Kleban. This time Mr. Kleban invested only $72,000, the amount necessary to complete the funding to build a third Checkers restaurant.

In August, 1992, based on representations by Messrs. Singer, Terzakis, and Thompson that a fourth Southwest Partnership restaurant would be built in Elmhurst, Illinois, Mr. Kleban made another $287,000 limited partnership investment. Mr. Kleban's check was not placed into the Southwest Partnership account, but used by CDDT instead.

In September of 1993, Mr. Kleban met with Mr. Singer, Mr. Garrity, and other defendants. At this meeting, the defendants present claimed that the imminent sale of CDDT back to the national franchisor would provide Mr. Kleban with an extraordinary return on his investment. They convinced Mr. Kleban to extend the repayment period of a loan he had made in July to CDDT and to loan CDDT an additional $100,000.

Defendants Singer and Garrity also intentionally misled investors about their ownership interest in certain Checkers restaurants and sent false financial statements for Southwest Partnership to the limited partners. They also told Mr. Kleban that Associates and its general partner were controlling Southwest Partnership, rather than CDDT who actually had control. Finally, defendants Singer, Terzakis, and Garrity also repeatedly misstated that Associates contributed one-half of the total capital contribution of Southwest Partnership and did so without encumbering the assets of Southwest Partnership.

Mr. Kleban also alleges that defendants Terzakis, Singer, and Garrity misrepresented the cost to develop the Southwest Partnership Checkers restaurants and then wrongfully took funds from Southwest Partnership to cover the construction cost overruns. In addition to using Southwest Partnership funds to cover construction cost overruns (for which CDDT was supposed to be responsible), the defendants commingled CDDT funds with those of Southwest Partnership and used Southwest Partnership funds for outside business expenses. The defendants then failed to inform Mr. Kleban that Southwest Partnership funds were being improper-

ly commingled with those of CDDT and instead assured him that proper accounting procedures were being implemented. Burling Bank encouraged the commingling of the partnership accounts and encumbered Southwest Partnership assets with loans it had made to CDDT.

The improper money management finally took its toll on CDDT, which filed for bankruptcy on December 8, 1994. Subsequently, on May 18, 1995, Mr. Kleban filed this suit.

## Analysis

### I. The Fraud Claims—Rule 10b–5, the Illinois Securities Act, & Common Law Fraud

The first three counts of Mr. Kleban's complaint allege federal (Count I) and state (Count II) securities fraud and common law fraud (Count III). Although he did not delineate in his complaint which counts applied to which defendants, Mr. Kleban stated in response to the various motions to dismiss that none of the fraud claims applied to Greenscape, RDC, Midwest Properties, Willowbrook, or IPC. Accordingly, Counts I, II, and III are dismissed against those defendants. Additionally, Mr. Kleban's only fraud claim against Burling Bank is for common law fraud. Counts I and II are therefore dismissed against Burling Bank. Finally, Mr. Kleban's only fraud claim against the IDDT defendants appears to be under Rule 10b–5. Consequently, Counts II and III are dismissed against them.

### A. The Individual Defendants— Terzakis, Garrity, & Singer

In Count I of his complaint, Mr. Kleban alleges violations of Rule 10b–5, promulgated under § 10(b) of the 1934 Act. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. To establish liability under 10b–5, Mr. Kleban must demonstrate that each defendant

(1) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading, (2) in connection with a securities transaction, (3) with the intent to mislead, and (4) which caused the plaintiff's loss.

*Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989).

Mr. Kleban alleges, *inter alia*, that Defendants Singer, Terzakis, and Garrity "repeatedly" told him that Associates, the general partner of Southwest Partnership, had contributed one-half of Southwest Partnership's start-up capital, and that this statement was untrue.[1]

For this misrepresentation to be deemed material, " 'there must be a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered "the total mix" of information made available' " to the investor. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). Whether a misrepresentation or omission is material is a question of fact for the jury. *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233–34 (7th Cir.1988). Here, a jury could find that whether the general partner of a partnership made the stated capital contribution is material, and thus Mr. Kleban has satisfactorily alleged the first requirement.

In addition, Mr. Kleban adequately alleges that the defendants made this misrepresentation in order to mislead Mr. Kleban and induce him to invest in the Southwest Partnership. Mr. Kleban also alleges that he relied on this misrepresentation in deciding to purchase his interest in the Southwest Partnership and therefore this statement caused his loss. Mr. Kleban has thus stated a claim against these defendants for securities fraud.

---

1. Mr. Terzakis argues that this allegation does not meet the requirements of Federal Rule of Civil Procedure 9(b) because it lumps together defendants and does not state when the misrepresentation was allegedly made. According to Mr. Terzakis, if Mr. Kleban does not specify exactly when the misrepresentation was made, Mr. Kleban cannot show that he relied on it when making his investment. I conclude that Mr. Kleban adequately names the four people who made this misrepresentation to him and states that they did so "repeatedly." Moreover, the fact that Mr. Kleban alleges that he relied on this misrepresentation necessarily implies that it was made prior to his investment.

■ Mr. Terzakis argues that this allegation cannot support a Rule 10b–5 claim because in other portions of his complaint Mr. Kleban states specific misrepresentations on which he relied in making particular investments. For example, Mr. Kleban alleges that "[o]n or about May 24, 1992, after representing to Plaintiff that the Bellwood restaurant was breaking all sales records since its opening on or about May 11, 1992, Mr. Thompson solicited Plaintiff to invest an additional $72,000 as a limited partner." Mr. Terzakis argues that because Mr. Kleban alleged that he relied on Mr. Thompson's representation to make his May 24, 1992 investment, Mr. Kleban cannot show that he relied on Mr. Terzakis' statement that Associates made half the capital contribution for Southwest Partnership in making his May, 1992 investment.[2] Mr. Kleban responds by arguing that Mr. Terzakis' statement (and misrepresentations by the other defendants) played a part in his investment decision. He points out that he did not allege that he relied *exclusively* upon Mr. Thompson's representation, and therefore I should look at the general group allegations of misrepresentations when evaluating the sufficiency of his claim.

I may dismiss this complaint only if "it appears beyond doubt that [Mr. Kleban] can prove no set of facts in support of his claim which would entitled him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Here, I cannot say that Mr. Kleban will not be able to prove that he relied both on the misrepresentation about Associate's capital contribution and on Mr. Thompson's representations in making his May 24, 1992 investment. Consequently, Count I stands against the individual defendants.

Based on this same misrepresentation, Mr. Kleban has stated a claim for a violation of Section 12 of the Illinois Security Act and for common law fraud. Accordingly, Counts II and III stand against the individual defendants.

### *B. The IDDT Defendants*

Mr. Kleban alleges a violation of Rule 10b–5 by the IDDT defendants.[3] These defendants contend that this claim must be dismissed against them because Mr. Kleban does not allege any misrepresentations or omissions by them. Mr. Kleban argues that they are liable as control persons under Section 20 of the 1934 Act.[4]

■ To determine whether the IDDT defendants may be held liable as control persons, the court must examine whether they "actually participated in, that is, exercised control over, the operations of the [wrongdoer(s) ] in general." *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir.1992), *cert. denied,* 509 U.S. 904, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993). Additionally, the court must consider "whether [the wrongdoers] possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Id.*

■ I initially dismissed the complaint against the IDDT defendants because Mr. Kleban had alleged that "CDDT was the sole controlling entity of the Checkers investment scheme and SOUTHWEST PARTNERSHIP." I found that if CDDT were the *sole* controlling entity of the Southwest Partnership, the IDDT defendants could not be liable as control persons. I also relied on the Joint Development Agreement in which

---

**2.** Mr. Kleban alleges similarly specific misrepresentations, which would not necessarily support Rule 10b–5 claims against all the individual defendants, relating to two of his other investments, made in August of 1992 and September of 1993. This Court has already held that Mr. Kleban's Rule 10b–5 claims relating to investments made in November, 1991 and February, 1992 are barred by the three-year period of repose.

**3.** The Rule 10b–5 violation appears to be Mr. Kleban's only claim against the IDDT defen-

dants. The parties do not address the liability of the IDDT defendants for any other claim raised in Mr. Kleban's complaint.

**4.** 15 U.S.C. § 78t(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."

Messrs. Sun, Young, and Singer agreed to divide the Chicago area for Checkers development and become competitors. Under this agreement, S.Y.S. transferred all of its "rights, duties and obligations" to CDDT and IDDT. Moreover, the Private Placement Memorandum for the Southwest Partnership, which Mr. Kleban had attached to his complaint, states that IDDT, with Messrs. Sun and Young as principals, was a competitor of CDDT. Because Mr. Kleban did not explain how a competitor of CDDT would retain control over its actions, I held that Mr. Kleban could not prove control person liability for the IDDT defendants.

Mr. Kleban has attempted to cure these defects with his amended complaint. First, Mr. Kleban dropped the allegation that CDDT was the "sole controlling entity" of the Southwest Partnership. Second, Mr. Kleban now alleges that S.Y.S. retained some control over CDDT. For example, Mr. Kleban alleges that IDDT and CDDT had rights to approve or veto the sites to be developed by the other. Additionally, any ground lease entered into by either IDDT or CDDT had to grant certain rights to the other, and IDDT and CDDT had certain rights with respect to any sale or transfer of a restaurant by the other. CDDT and IDDT also agreed on joint marketing efforts and jointly held any restaurant's intellectual property with S.Y.S. S.Y.S., CDDT, and IDDT agreed to share information about the financial operations of Chicago area Checkers restaurants as well. Finally, CDDT and IDDT could not communicate with Checkers without the prior written consent of S.Y.S. Mr. Kleban also alleges that the IDDT defendants knew of Mr. Singer's "character and questionable business practices," were in control of Mr. Singer's ability to develop Checkers restaurant, and benefited from allowing him to do so.

Mr. Kleban's additional allegations do not help him to state a claim for control person liability on the part of the IDDT defendants. Even if the IDDT defendants had some control over CDDT's affairs, Mr. Kleban's allegations do not support the proposition that they "possessed the power or ability to control the specific transaction" at issue here, *i.e.*, Mr. Kleban's investment in the South-

west Partnership and the misrepresentations made by Singer and the other defendants. Mr. Kleban does not allege that the IDDT defendants had the means to control CDDT's corporate setup or its business promotion. Additionally, the IDDT defendants' ability to veto a potential site for a Checkers restaurant does not imply that they had the power to control the fraudulent actions taken by Mr. Singer and the other individual defendants.

Mr. Kleban argues that, contrary to the statement in the Joint Development Agreement that IDDT and CDDT are competitors, the two are not true competitors because they retained some control over each other. Whether IDDT and CDDT are "true" competitors, however, is not the relevant inquiry under Section 20(a) of the 1934 Act. To withstand a motion to dismiss, Mr. Kleban must allege facts to show that the IDDT defendants had the power to control the fraudulent acts about which he complains. Because he has not done so, the Rule 10b–5 claim, and consequently the entire complaint, will be dismissed against the IDDT defendants.

### C. Burling Bank

 Mr. Kleban does not accuse Burling Bank of violating either state or federal securities laws, but does allege that it has committed common law fraud. To state a common law fraud claim, Mr. Kleban must allege:

> (1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury.

*Siegel v. Levy Organization Development Co.,* 153 Ill.2d 534, 180 Ill.Dec. 300, 304, 607 N.E.2d 194, 198 (1992). I have combed through Mr. Kleban's complaint and cannot find a single allegation of a false statement of material fact made by defendant Burling

Bank.[5] Mr. Kleban alleges that the bank "knowingly engaged in, supported and/or ignored the actions and investment schemes" of the individual defendants. He also alleges that Burling Bank "orchestrated the filing of the bankruptcy case of CDDT to cover up the fraud perpetrated upon investors." In no place, however, does Mr. Kleban allege a misrepresentation made by the bank to induce him to act. In fact, the only allegation Mr. Kleban makes about Burling Bank's responsibility for his investment is an allegation that an officer of Burling "actively solicited investors for contributions to CDDT and various other related partnerships." Mr. Kleban does not allege that this officer made any misrepresentation in soliciting the investment, however. Accordingly, Count III will be dismissed against Burling Bank.

## II. Negligent Misrepresentation

In Count IV of his complaint, Mr. Kleban attempts to state a claim for negligent misrepresentation. Again, Mr. Kleban's complaint does not specify which defendants he sues in this count, but in response to the various motions to dismiss, Mr. Kleban states that the claim applies only to the individual defendants. Accordingly, Count IV will be dismissed against Greenscape, RDC, Midwest Properties, Willowbrook, IPC, and Burling Bank.

■ To hold the individual defendants liable for negligent misrepresentation, Mr. Kleban must demonstrate that each defendant (1) made a negligent misrepresentation of a material fact; (2) is in the business of providing investment information; and (3) made the misrepresentation while guiding Mr. Kleban in his "business relations with third parties." *Rankow v. First Chicago Corp.*, 870 F.2d 356, 362–63 (7th Cir.1989) (quoting *Black, Jackson and Simmons Insurance Brokerage, Inc. v. International Business Machines Corp.*, 109 Ill.App.3d 132, 64 Ill. Dec. 730, 732, 440 N.E.2d 282, 284 (1982)) (emphasis in both originals).

I dismissed this claim from Mr. Kleban's original complaint because he alleged that he dealt directly with Messrs. Terzakis, Singer, and Garrity and that these defendants made misrepresentations in order to induce Mr. Kleban to deal with them. Because the defendants were not "third parties," I dismissed his claim.

Mr. Kleban has attempted to cure this defect by alleging that the defendants made their misrepresentations not to induce Mr. Kleban only to invest in CDDT and Southwest Partnership, but also to invest in other businesses, which Mr. Kleban names in his complaint. The misrepresentations alleged by Mr. Kleban, however, all relate to the CDDT and the Checkers operation. Moreover, even if these allegations were sufficient to show that Mr. Kleban could prove that the misrepresentations made by the defendants related to doing business with other people, Mr. Kleban still fails to state a claim for negligent misrepresentation because he has not alleged that the individual defendants are in the business of providing investment information. Mr. Kleban has not alleged an essential element of a claim for negligent misrepresentation, and therefore Count IV is dismissed against all moving defendants.

## III. Violations of RICO

■ In Count V, Mr. Kleban alleges that the defendants violated § 1962(c) of RICO. To state a claim for a violation of this section, Mr. Kleban must allege conduct of an enterprise through a pattern of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). To satisfy the pattern requirement, Mr. Kleban must fulfill the "continuity plus relationship" test by showing two or more predicate acts that are related to one another and pose a threat of continued criminal activity. *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir.1992) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900–01, 106 L.Ed.2d 195 (1989)). If the scheme constituting the predicate acts has ended, Mr. Kleban must demonstrate that the wrongful conduct "endur[ed] a 'substantial period of time' . . . [so

---

5. The brief filed by Mr. Kleban in response to Burling Bank's motion to dismiss fails to point to any such allegation in the complaint.

that it] carries with it an implicit threat of continued criminal activity in the future." *Midwest Grinding*, 976 F.2d at 1022–23 (quoting *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902).

In determining whether RICO liability should result from allegations that the fraud is likely to recur, the Seventh Circuit advocates a multifactor continuity test. *Midwest Grinding*, 976 F.2d at 1023–24. Thus I must consider "the duration of time over which the predicate acts were committed, the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries." *Id.* at 1024.

■ I dismissed the RICO claim in Mr. Kleban's original complaint because Mr. Kleban had alleged a single scheme—the Southwest Partnership venture. And although Mr. Kleban had alleged several different purchases of an interest in the partnership, I found that these separate investments did not constitute "distinct injuries." I held that the only injury Mr. Kleban suffered at the hands of the defendants was the loss of his investment in the partnership. The fact that he made this investment in installments did not alter this conclusion.[6] I also noted that Mr. Kleban had not alleged that there were any other victims whom the defendants had injured. Thus although the Checkers operation had lasted over three years and the defendants had allegedly committed securities fraud several times, I found the continuity requirement not fulfilled.

Mr. Kleban has attempted to replead his RICO claim by adding several allegations. For example, Mr. Kleban argues that the fraud is continuing due to CDDT's bankruptcy petition and the ongoing case in the bankruptcy court. Mr. Kleban also adds allegations that other investors in the Southwest Partnership venture were defrauded. Finally, Mr. Kleban alleges that the individual defendants "solicited investors and/or converted existing funds of the partnerships to a series of [business operations not related to Checker restaurants] now insolvent or bankrupt." Mr. Kleban does not allege, however, that those other business committed any fraud or that he invested in them and lost any money. Indeed, when listing his damages, Mr. Kleban identifies only his lost investment in the various entities developing Checkers restaurants.

Even with the additional allegations pled by Mr. Kleban, Count V does not state a claim upon which relief may be granted. The fact that CDDT is in bankruptcy and Mr. Kleban, as a creditor in the bankruptcy, objects to certain transfers of assets and other facets of the bankruptcy does not establish an ongoing enterprise. CDDT and the other non-Checkers operations mentioned by Mr. Kleban are all in bankruptcy. Consequently, those schemes have ended. I must therefore decide whether there is an "implicit threat" of future criminal activity.

Looking at the multi-factor continuity test provided in *Midwest Grinding*, I find that Mr. Kleban has still not alleged facts showing that he can demonstrate that the fraud is likely to recur. Here, the predicate acts were committed over a substantial period of time, three years, and although Mr. Kleban alleges 15 separate predicate acts, they are all mail fraud, wire fraud, or securities fraud related to the Checkers operation. Moreover, although Mr. Kleban alleges the presence of other victims, he provides no facts regarding how many of them there were or how they were defrauded. Mr. Kleban also attempts to allege the presence of separate schemes, by claiming that the defendants solicited investors for other business operations, but he does not assert that the defendants have committed fraud in doing so. Finally, Mr. Kleban still fails to allege distinct injuries. He simply lost his investment in Checkers restaurants. For these reasons, I find that Mr. Kleban cannot establish the continuity requirement and consequently his RICO claim will be dismissed.

---

6. Mr. Kleban had attempted to characterize his injuries as "the loss of seven separate sums of money at seven different times." I explained that Mr. Kleban may have made seven separate investments in the Checkers operation, but he did not lose the money until his interest in the Southwest Partnership actually lost its value.

## IV. Conversion

In Count VI of his complaint, Mr. Kleban attempts to state a claim for conversion. To succeed on a conversion claim in Illinois, Mr. Kleban must establish " 'a tortious conversion of the chattel, a right to property in it, and a right to immediate possession which is absolute.' " *National Union Fire Ins. Co. v. Wilkins–Lowe & Co.,* 29 F.3d 337, 340 (7th Cir.1994) (quoting *In re Thebus,* 108 Ill.2d 255, 91 Ill.Dec. 623, 625, 483 N.E.2d 1258, 1260 (1985)). Although a plaintiff may sue in conversion to recover money, " 'an action for conversion of funds may not be maintained to satisfy a mere obligation to pay money.... It must be shown that the money claimed ... at all times *belonged to the plaintiff* and that the defendant converted it to his own use.' " *Wilkins–Lowe,* 29 F.3d at 340 (quoting *Thebus,* 91 Ill.Dec. at 625–26, 483 N.E.2d at 1260–61) (emphasis added in *Wilkins–Lowe).*

Mr. Kleban can show neither that he has an immediate right to return of the funds allegedly converted by the defendants nor that the funds have always belonged to him. Mr. Kleban alleges that the defendants "wrongfully converted funds of [the Southwest Partnership], along with funds from loans and investments in CDDT." Money owed to the Southwest Partnership or CDDT is not property belonging to Mr. Kleban. As Mr. Terzakis points out, an individual partner does not have standing to sue a third party to recover property belonging to the partnership. *See Sindelar v. Walker,* 137 Ill. 43, 27 N.E. 59 (1891). Consequently, Mr. Kleban cannot sue under a conversion theory to recover the investment he made in the Southwest Partnership.

Mr. Kleban concedes that this principle bars his suit to recover Southwest Partnership funds, but he advances two arguments why his claim should stand anyway. First, Mr. Kleban argues that, in addition to the Southwest Partnership investment, he lent money to CDDT as a shareholder. As with his partnership investment, however, Mr. Kleban has no immediate right to possess money he lent to CDDT. He is a creditor of CDDT who must follow proper bankruptcy procedures to obtain the debt CDDT owes to him. Moreover, as a shareholder of CDDT seeking to recover money misappropriated from CDDT, Mr. Kleban's proper remedy is a shareholder derivative action. *See, e.g., Borgsmiller v. Burroughs,* 187 Ill. App.3d 1, 134 Ill.Dec. 774, 779, 542 N.E.2d 1281, 1286 (5th Dist.1989) ("[A] cause of action for misappropriation of corporate assets belongs to the corporation rather than to individual stockholders, and must be brought in a derivative action."). He may not attempt simply to obtain funds belonging to CDDT for himself. Finally, because Mr. Kleban lent the money to CDDT, he cannot show that the money "at all times belonged to [him]."

Mr. Kleban also argues that "it is entirely unclear as to whether [sic] any or all of the Plaintiff's monies were ever applied to the Southwest or CDDT accounts." Mr. Kleban's theory seems to be that if someone had wrongfully cashed his check and never given the money to the Southwest Partnership or to CDDT, then he would have a claim for conversion against that person. However, Mr. Kleban does not allege that the defendants stole his check, rather than depositing it into CDDT's account. He alleges that the *moving defendants* stole money from the Southwest Partnership and CDDT. Because Mr. Kleban cannot show an immediate right to possess those funds, his claim for conversion will be dismissed against the moving defendants.

### Conclusion

For the reasons stated above, the complaint against S.Y.S., IDDT, Mr. Sun, Mr. Young, Midwest Properties, Willowbrook, IPC, RDC, Greenscape, and Burling Bank is dismissed. Counts IV, V, and VI are dismissed as to Messrs. Terzakis, Singer, and Garrity.

### JUDGMENT ORDER

**THIS MATTER** coming to be heard upon the Plaintiff's Motion for the Entry of a Default Judgment against the Defendant, CHECKERS DRIVE–IN RESTAURANTS, INC., a Delaware corporation, the parties

being duly notified and the Court being fully advised in the premises:

**IT IS HEREBY ORDERED:**

1. Pursuant to a Prove–Up Hearing held by way of Affidavit, Default Judgment in the amount of $4,162,018.80 is entered in favor of the Plaintiff and against the Defendant, CHECKERS DRIVE–IN RESTAURANTS, INC.

2. This Order is a final and appealable Order and the Court finds that there is no just reason to delay appeal or enforcement of this Order.